NORRINGTON *v.* WRIGHT & Others.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF PENNSYLVANIA.

Argued January 20, 21, 1885.—Decided October 26, 1885.

In a mercantile contract, a statement descriptive of the subject-matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty, or condition precedent, upon the failure or non-performance of which the party aggrieved may repudiate the whole contract.

Under a contract made in Philadelphia, for the sale of "5,000 tons iron rails, for shipment from a European port or ports, at the rate of about 1,000 tons per month, beginning February, 1880, but whole contract to be shipped before August 1, 1880, at $45 per ton of 2,240 lbs. custom-house weight, ex ship Philadelphia ; settlement cash on presentation of bills accompanied by custom-house certificate of weight ; sellers not to be compelled to replace any parcel lost after shipment ;" the sellers are bound to ship 1,000 tons in each month from February to June inclusive, except that slight and unimportant deficiencies may be made up in July ; and if only 400 tons are shipped in February, and 885 tons in March, and the buyer accepts and pays for the February shipment on its arrival in March, at the stipulated

price and above its market value, and in ignorance that no more has been shipped in February, and is first informed of that fact after the arrival of the March shipments and before accepting or paying for either of them, he may rescind the contract by reason of the failure to ship about 1,000 tons in each of the months of February and March.

This was an action of assumpsit, brought by Arthur Norrington, a citizen of Great Britain, trading under the name of A. Norrington & Co., against James A. Wright and others, citizens of Pennsylvania, trading under the name of Peter Wright & Sons, upon the following contract:

"Philadelphia, January 19, 1880. Sold to Messrs. Peter Wright & Sons, for account of A. Norrington & Co., London: Five thousand (5,000) tons old T iron rails, for shipment from a European port or ports, at the rate of about one thousand (1,000) tons per month, beginning February, 1880, but whole contract to be shipped before August 1st, 1880, at forty-five dollars ($45.00) per ton of 2,240 lbs. custom-house weight, ex ship Philadelphia. Settlement cash on presentation of bills accompanied by custom-house certificate of weight. Sellers to notify buyers of shipments with vessels' names as soon as known by them. Sellers not to be compelled to replace any parcel lost after shipment. Sellers, when possible, to secure to buyers right to name discharging berth of vessels at Philadelphia.

"EDWARD J. ETTING, Metal Broker."

The declaration contained three counts. The first count alleged the contract to have been for the sale of about 5,000 tons of T iron rails, to be shipped at the rate of about 1,000 tons a month, beginning in February, and ending in July, 1880. The second count set forth the contract *verbatim*. Each of these two counts alleged that the plaintiffs in February, March, April, May, June and July shipped the goods at the rate of about 1,000 tons a month, and notified the shipments to the defendants; and further alleged the due arrival of the goods at Philadelphia, the plaintiff's readiness to deliver the goods and bills thereof, with custom-house certificates of weight, according to the contract, and the defendants' refusal to accept them.

The third count differed from the second only in averring that 400 tons were shipped by the plaintiff in February and accepted by the defendants, and that the rest was shipped by the plaintiffs at the rate of about 1,000 tons a month in March, April, May, June and July. The defendants pleaded non assumpsit. The material facts proved at the trial were as follows:

The plaintiff shipped from various European ports 400 tons by one vessel in the last part of February, 885 tons by two vessels in March, 1,571 tons by five vessels in April, 850 tons by three vessels in May, 1,000 tons by two vessels in June, and 300 tons by one vessel in July, and notified to the defendants each shipment.

The defendants received and paid for the February shipment upon its arrival in March, and in April gave directions at what wharves the March shipments should be discharged on their arrival; but on May 14, about the time of the arrival of the March shipments, and having been then for the first time informed of the amounts shipped in February, March and April, gave Etting written notice that they should decline to accept the shipments made in March and April, because none of them were in accordance with the contract; and, in answer to a letter from him of May 16, wrote him on May 17 as follows: "We are advised that what has occurred does not amount to an acceptance of the iron under the circumstances and the terms of the contract. You had a right to deliver in parcels, and we had a right to expect the stipulated quantity would be delivered until the time was up in which that was possible. Both delivering and receiving were thus far conditional on there being thereafter a complete delivery in due time and of the stipulated article. On the assumption that this time had arrived, and that you had ascertained that you did not intend to, or could not, make any further deliveries for the February and March shipments, we gave you the notice that we declined accepting those deliveries. As to April, it is too plain, we suppose, to require any remark. If we are mistaken as to our obligation for the February and March shipments, of course we must abide the consequences; but if we are right, you have

not performed your contract, as you certainly have not for the April shipments. There is then the very serious and much debated question, as we are advised, whether the failure to make the stipulated shipments in February or March has absolved us from the contract. If it does, we of course will avail ourselves of this advantage."

On May 18, Etting wrote to the defendants, insisting on their liability for both past and future shipments, and saying, among other things : " In respect to the objection that there had not been a complete delivery in due time of the stipulated article, I beg to call your attention to the fact that while the contract is for five thousand tons, it expressly stipulates that deliveries may be made during six months, and that they are only to be at the rate of about one thousand tons per month." " As to April, while it seems to me ' too plain to require any remark,' I do not see how it can seem so to you, unless you intend to accept the rails. If you object to taking all three shipments made in that month, I shall feel authorized to deliver only two of the cargoes, or, for that matter, to make the delivery of precisely one thousand tons. But I think I am entitled to know definitely from you whether you intend to reject the April shipments, and, if so, upon what ground, and also whether you are decided to reject the remaining shipments under the contract. You say in your last paragraph that you shall avail yourselves of the advantage, if you are absolved from the contract; but as you seem to be in doubt whether you can set up that claim or not, I should like to know definitely what is your intention."

On May 19, the defendants replied: " We do not read the contract as you do. We read it as stipulating for monthly shipments of about one thousand tons, beginning in February, and that the six months clause is to secure the completion of whatever had fallen short in the five months. As to the meaning of ' about,' it is settled as well as such a thing can be ; and certainly neither the February, March, nor April shipments are within the limits." " As to the proposal to vary the notices for April shipments, we do not think you can do this. The notice of the shipments, as soon as known, you were bound to

give, and cannot afterwards vary it if they do not conform to the contract. Our right to be notified immediately that the shipments were known is as material a provision as any other, nor can it be changed now in order to make that a perform- ance which was no performance within the time required." " You ask us to determine whether we will or will not object to receive further shipments because of past defaults. We tell you we will if we are entitled to do so, and will not if we are not entitled to do so. We do not think you have the right to compel us to decide a disputed question of law to relieve you from the risk of deciding it yourself. You know quite as well as we do what is the rule and its uncertainty of application."

On June 10, Etting offered to the defendants the alternative of delivering to them 1,000 tons strict measure on account of the shipments in April. This offer they immediately declined.

On June 15, Etting wrote to the defendants that two cargoes, amounting to 221 tons, of the April shipments, and two cargoes, amounting to 650 tons, of the May shipments (des- ignated by the names of the vessels), had been erroneously notified to them, and that about 900 tons had been shipped by a certain other vessel on account of the May shipments. On the same day, the defendants replied that the notification as to April shipments could not be corrected at this late date, and after the terms of the contract had long since been broken.

From the date of the contract to the time of its rescission by the defendants, the market price of such iron was lower than that stipulated in the contract, and was constantly falling. After the arrival of the cargoes, and their tender and refusal, they were sold by Etting, with the consent of the defendants, for the benefit of whom it might concern.

At the trial, the plaintiff contended, 1st. That under the contract he had six months in which to ship the 5,000 tons, and any deficiency in the earlier months could be made up subse- quently, provided that the defendants could not be required to take more than 1,000 tons in any one month. 2d. That, if this was not so, the contract was a divisible contract, and the remedy of the defendants for a default in any month was not by rescission of the whole contact, but only by deduction of

the damages caused by the delays in the shipments on the part of the plaintiff.

But the court instructed the jury that if the defendants, at the time of accepting the delivery of the cargo paid for, had no notice of the failure of the plaintiff to ship about 1,000 tons in the month of February, and immediately upon learning that fact gave notice of their intention to rescind, the verdict should be for them.

The plaintiff excepted to this instruction, and, after verdict and judgment for the defendants, sued out this writ of error.

*Mr. Samuel Dickson* and *Mr. J. C. Bullitt* for plaintiff in error.—Under this contract the plaintiff was at liberty to tender rails shipped by sailing vessels from any European port. It is apparent, therefore, that regularity of delivery was not deemed of importance, as the cargoes might have been sent from any port from the Baltic to the Black Sea, and the time of crossing might have varied from three weeks to four or five months. The rate of shipment was to be " about 1,000 tons per month," but the whole contract was to be shipped within six months ; and the entirety of the delivery was of so little consequence, that the sellers were not to be compelled to replace any parcel lost after shipment. The reasonable explanation of this latitude in performance is found in the condition of things in January, 1880, when the whole world was scoured for old iron to supply the extraordinary demand which had sprung up in this country, and in the fact, perfectly well known to the defendants, that the rails to be shipped under this contract would have to be picked up in odd lots, wherever they could be found, from one end of Europe to the other, and shipped from ports where promptness and dispatch could not be counted on. The natural meaning of the contract, therefore, is that the plaintiffs were to ship the iron as early as possible, " at the rate of about 1,000 tons per month ; " but if the peculiar circumstances of the times rendered it impossible to comply exactly with this stipulation, an extra month should be allowed in which to complete the shipments. The subsequent conduct of the defendants confirms this view. The only question con-

sidered by the court below was whether, under such a contract, a purchaser who had accepted and paid for part of a monthly shipment, could rescind as to the balance upon discovery that the full amount of that shipment had not been sent. In fact, they did not at that time elect to rescind, but simply to reject the March and April shipments. Preliminary to any question as to the legal results of the contract, however, comes its construction. As the plaintiff views it, it permitted a shipment of 400 tons in the first month, and of 600 tons in the last month, or of 833 tons in each month. If this view be taken, the questions argued below become unimportant.

I. The plaintiffs were not in default by reason of having shipped only 400 tons in the month of February. The court below adopted the construction of the contract suggested by the defendants, viz., that the shipments were to be at the rate of about 1,000 tons per month, beginning with the month of February, and that it was only the deficiencies covered by the word "about" that could be shipped at the option of the vendors in the sixth month. It is submitted, however, that the natural meaning to be given to the clause extending the time of performance for another month, is to give another month for performance, subject to the condition that defendants should not be obliged to take more than about 1,000 tons in any one month. The circumstances of the case strengthen this view, as it is to be supposed that the mode of performance actually adopted was then present in the minds of the parties; and the difficulties in making shipments in remote and widely-scattered ports, having imperfect facilities for loading, by small sailing vessels, are such that naturally provision was made for accidents and unavoidable difficulties. As already suggested, the exemption from any obligation to replace lost shipments, and the inevitable uncertainty in respect to the time of arrival, tend to show that regularity and completeness of delivery were of secondary importance. As to the excess or deficiency covered by the word "about," see. *Brown* v. *Weir*, 5 S. & R. 401; *Baird* v. *Johnson*, 2 J. S. Green (N. J.) 120, 123; *De Witt* v. *Morris*, 13 Wend. 496, 498; *Pembroke Iron Co.* v. *Parsons*, 5 Gray, 589; *Tamvaco* v. *Lucas*, 1 El. & El. 581. That the

tender of 1,000 tons for April out of the 1,347 actually shipped was proper, is settled by *Borrowman* v. *Free*, 4 Q. B. D. 500. See also on this point *Dixon* v. *Fletcher*, 3 M. & W. 146, 149.

II. The defendants did not elect to rescind the entire contract. The question which is now regarded as the decisive inquiry in the case of a default under a divisible contract is, whether the conduct of the party in default justifies the other side in considering that he has entirely renounced the contract or refused to go on with it; and here, even as late as June 15 the defendants wrote in such a way as to leave it uncertain whether they regarded the contract as at an end or not.

By so playing fast and loose, they compelled the plaintiff to go on with his deliveries, as, if he had abandoned, they would then have been in a position to object that he had not completed his contract; and whether such was the motive in this case is immaterial, as it might well be in future cases; and it is important that in mercantile transactions men should be compelled to speak out promptly, and if they intend to get the benefit of rescission for themselves, that they should be obliged to give it to the other side. It is true that under the doctrine of *Hochster* v. *De la Tour*, 2 El. & Bl. 678, which has now been adopted by this court, *Lovell* v. *Insurance Co.*, 111 U. S. 264, the plaintiffs would have been quite clearly justified in suspending shipments; but their right to do so rested on a question of fact which must have gone to a jury, and the defendants cannot now allege that they did rescind, when they expressly and repeatedly refused to do so when asked to make their election. It is not worth while to encumber this argument with a citation of the authorities as to the necessity for prompt and decisive action, where a party proposes to rescind.

III. The defendants could not rescind after having accepted and paid for the first shipment. Even Lord Bramwell admits that after a severable contract has been partly performed, rescission is impossible. See also *Scott* v. *Kittanning Coal Co.*, 89 Penn. St. 231; *Lyon* v. *Bertram*, 20 How. 149; *Morse* v. *Brackett*, 98 Mass. 205; and the authorities collected in 19 Am. Law Reg. 423.

IV. Defendants were not entitled to rescind, even if there

had been default in respect of the February shipment. The question here raised is of the first importance, and, singularly enough, it has only been finally set at rest in England within the last few months, while no authoritative decision has yet been made in the United States. It involves the whole law of dependent and independent covenants, and of entire and severable or divisible contracts; and it cannot well be discussed without some reference to the great cases of *Boone* v. *Eyre*, 1 H. Bl. 273 *n*; *Pordage* v. *Cole*, 1 Wms. Saund. 6 Ed. 319 *l*; and *Cutter* v. *Powell*, 6 T. R. 320; 2 Smith's Lead. Cas. 1; but it is not proposed, here, to do more than to refer briefly to the earlier authorities, which have only a general application to the subject, and then to present the later English decisions, in which the precise question has been considered and argued with unexampled earnestness by nearly every contemporary judge ot eminence, until finally, in August last, the House of Lords settled the controversy upon that side of the Atlantic. At the outset it is only necessary to point out that the contract in question is clearly severable or divisible. The shipments were to be made monthly. They were to come from any European port. They were in fact shipped in sailing vessels, in lots as small as eighty tons, and were from two to three months on the voyage. They were to be paid for on presentation of bills, accompanied by custom-house certificates of weight. The sellers were not bound to replace any parcel lost after shipment. The purchasers were importing merchants, who showed no special reason why regularity or punctuality or completeness of delivery was essential. The article sold was easily replaced, having no value except for remanufacture, and steadily declined in price from the date of the contract till the last tender and refusal. All the *indicia* of a divisible contract are found here, and just such contracts, in legal effect, have been over and over again declared severable. The text-book statement of the distinction between entire and severable contracts which has oftenest met with the approval of the courts is that contained in 2 Parsons on Contracts, 29–31: "If the part to be performed by one party consists of several and distinct items, and the price to be paid by the other is apportioned

to each item to be performed, or is left to be implied by law, such a contract will generally be held to be severable. . . . But if the consideration to be paid is single and entire, the contract must be held to be entire, although the subject of the contract may consist of several distinct and wholly independent items." See *Lucesco Oil Co.* v. *Bremer*, 66 Penn. St. 351; *Morgan* v. *McKee*, 77 Penn. St. 229; *Perkins* v. *Hart*, 11 Wheat. 226. Also the opinion of BRADLEY, J., in *Hambly* v. *Delaware, M. & V. Railroad Co.*, 21 Fed. Rep. 541, 544.

But if this contract is severable, the question remains, whether the failure of the seller to supply the first monthly instalment according to contract would of itself entitle the purchaser to rescind the entire contract. The clear answer of the authorities is, that it does not, unless the failure to deliver the first lot was accompanied by such other circumstances as would warrant a jury in finding that the plaintiff had manifested an intention of abandoning the contract, or it is the fair import of the contract that a failure in part would go to the entire consideration. Upon the general proposition, Benjamin on Sales, § 426, is as follows: "Where the failure of consideration is only partial, the buyer's right to rescind will depend on the question whether the contract is entire or not. Where the contract is entire, and the buyer is not willing to accept a partial performance, he may reject the contract *in toto*, and recover back the price." The converse is equally true. If the contract is not entire, a failure in one delivery will not, without more, justify a rescission. This is now clearly settled in England, and it is submitted that the result there reached is fully sustained by the weight of authority; see the authorities collected in 21 Am. Law Reg. 395, 398, * in an article by Mr.

---

* *Note by Reporter.*—The following are such of the authorities cited in that article as are not otherwise referred to by the counsel in argument:

*Allen* v. *McKibben*, 5 Mich. 449, 454; *Bradford* v. *Williams*, 7 L. R. Ex. 259; *Bradley* v. *King*, 44 Ill. 339; *Catlin* v. *Tobias*, 26 N. Y. 217; *Cole* v. *Cheovenda*, 4 Colorado, 17; *Coleman* v. *Hudson*, 2 Sneed, 463; *Dibol* v. *Minott*, 9 Iowa, 403; *Drake* v. *Gorce*, 22 Ala. 409; *Deming* v. *Kemp*, 4 Sandf. S. C. 147; *Dugan* v. *Anderson*, 36 Maryland, 567; *Dwinel* v. *Howard*, 30 Maine, 258; *Dunlap* v. *Petrie*, 35 Mississippi, 590; *Fletcher* v. *Cole*, 23 Vermont, 114;

Landreth, by his permission made part of our brief on behalf of plaintiff in error.

*Milldam Foundery* v. *Hovey*, 21 Pick. 417, is the leading case in the United States. It establishes, that to constitute an undertaking a condition precedent, it must appear (1) That it is in terms such; or, (2) That the act stipulated for must *necessarily* precede the act claimed to be dependent upon it; or, (3) That the non-performance on one side goes to the entire substance of the contract, and to the whole consideration. Shaw, C. J., says: "It seems to be well settled, that when there is a stipulation amounting to a condition precedent, the failure of one party to perform such condition will excuse the other party from all further performance of stipulations depending upon such prior performance; but a failure to perform an independent stipulation, not amounting to a condition precedent, though it subject the party failing to damages, does not excuse the party on the other side from the performance of all stipulations on his part." *Havelock* v. *Geddes*, 10 East, 555; *Boone* v. *Eyre*, cited above. In dealing with real estate, it is conceded that if the contract is divisible the vendor can compel acceptance of one parcel, though unable to make title to the other, and this at law or in equity. A leading authority is *John-*

*Fothergill* v. *Walton*, 8 Taunton, 576; *Gallup* v. *Barnell*, Brayt. 191; *Glazebrook* v. *Woodrow*, 8 T. R. 366; *Goodwin* v. *Merrill*, 13 Wisc. 658; *Haines* v. *Tucker*, 50 N. H. 307; *Hewitt* v. *Berryman*, 5 Dana, 162; *Hirne* v. *Klasey*, 9 Brad. App. Ill. 166; *Holmesley* v. *Elias*, 75 N. C. 564; *King Philip Mills* v. *Slater*, 12 R. I. 82; *Kennedy* v. *Schwartz*, 13 Nevada, 229; *Kirkland* v. *Oates*, 25 Ala. 465; *Lee* v. *Bebee*, 13 Hun, 89; *Ligget* v. *Smith*, 3 Watts, 331; *Loomis* v. *Eagle Bank of Rochester*, 10 Ohio St. 327; *McDaniels* v. *Whitney*, 38 Iowa, 60; *Maryland Fertilizing Co.* v. *Lorentz*, 44 Maryland, 218; *Miner* v. *Bradley*, 22 Pick. 457; *More* v. *Bonnet*, 40 California, 251; *Newton* v. *Winchester*, 16 Gray, 208; *Norris* v. *Harris*, 15 California, 226; *Obernyer* v. *Nichols*, 6 Binn. 159; *Pattridge* v. *Gildermeister*, 1 Keyes, 93; *Purdy* v. *Bullard*, 41 California, 444; *Robson* v. *Bohn*, 27 Minnesota, 333; *Sawyer* v. *Chicago & N. W. Railway Co.*, 22 Wisc. 403; *Seymour* v. *Davis*, 2 Sandf. S.C. 239; *Shinn* v. *Bodine*, 60 Penn. St. 182; *Smith* v. *Lewis*, 40 Ind. 98; *Snook* v. *Fries*, 19 Barb. 313; *Storer* v. *Gordon*, 3 M. & S. 308; *Swift* v. *Opdyke*, 43 Barb. 274; *Talmadge* v. *White*, 35 N. Y. Superior Ct. 218; *Taylor* v. *Gallup*, 8 Vermont, 340; *Thompson* v. *Conover*, 3 Vroom, 466; *Tipton* v. *Feitner*, 20 N. Y. 423; *Trimble* v. *Green*, 3 Dana, 353; *Tyson* v. *Doe*, 15 Vermont, 571; *Winchester* v. *Newton*, 2 Allen, 492.

*son* v. *Johnson*, 3 Bos. & Pul. 162. In such cases the question always is whether the parts are so related that the acquisition of each was the consideration for the purchase of the others. If not, the vendor can recover, though unable to perform as stipulated. See also *Stoddardt* v. *Smith*, 5 Binn. 355; *Graver* v. *Scott*, 80 Penn. St. 88. It is contended, however, that a different rule prevails in respect to land from that governing sales of chattels. No good reason can be assigned for the distinction. Time may be of the essence of a mercantile contract, but it is not necessarily so. In dealing with articles of a fluctuating value, courts of equity recognize the duty of promptness, but such cases are avowedly exceptional; and Chancellor Kent, in his Commentaries, blends the two classes, and treats of them as identical in principle. 2 Kent Com. 470, 475; 2 Chitty Contracts, 11th Am. Ed. 1092; *Franklin* v. *Miller*, 4 Ad. & El. 599, 605; *Johnassohn* v. *Young*, 4 B. & S. 296; *Weaver* v. *Sessions*, 6 Taunton 155; *Keenan* v. *Brown*, 21 Vermont 86. The case of *Franklin* v. *Miller* is referred to by both Kent and Chitty, and is of special importance. See also *London Gas Light Co.* v. *Chelsea*, 8 Scott N. R. 215.

*Hoare* v. *Rennie*, 5 H. & N. 19, is an authority for defendants in error, but it has been overruled. It was not followed in *Johnassohn* v. *Young*, already cited, and was overruled in *Simpson* v. *Crippin*, L. R. 8 Q. B. 14 (1872). In that case, defendants agreed to supply plaintiffs with from six thousand to eight thousand tons of coal, to be delivered into plaintiffs' wagons, at defendants' collieries, in equal monthly quantities, during the period of twelve months, at five shillings and six pence per ton. During the first month, plaintiffs sent wagons to receive only one hundred and fifty-eight tons. Immediately after the first month had expired, the defendants informed plaintiffs that, as plaintiffs had taken only one hundred and fifty-eight tons, defendants would annul the contract. Plaintiffs refused to allow the contract to be annulled, but defendants declined to deliver any more coal:—Blackburn, J., said: " The defendants contend, that the sending of a sufficient number of wagons by the plaintiffs, to receive the coal, was a condition precedent to the continuance of the contract, and they

rely upon the terms of the letter of the 1st of August. No sufficient reason has been urged why damages would not be a compensation for the breach by the plaintiffs, and why the defendants should be at liberty to annul the contract; but it is said that *Hoare* v. *Rennie* is in point, and that we ought not to go counter to the decision of a court of co-ordinate juris-diction. It is, however, difficult to understand upon what principle *Hoare* v. *Rennie* was decided. If the principle on which that case was decided is that wherever a plaintiff has broken his contract first, he cannot sue for any subsequent breach committed by the defendant, the decision would be op-posed to the authority of many other cases. I prefer to follow *Pordage* v. *Cole.* No reason has been pointed out why the defendants should not have to deliver the stipulated quantity of coal during each of the months after July, although the plaintiffs in that month failed to accept the number of tons contracted for. *Hoare* v. *Rennie* was questioned in *Johnas-sohn* v. *Young.*"

*Roper* v. *Johnson*, L. R. 8 C. P. 167, followed in 1873, and in 1874 *Freeth* v. *Burr*, 9 C. P. 208. In the latter case Lord Cole-ridge made the following statement of the rule governing these cases, which has been frequently cited with approval: " In cases of this sort, where the question is whether the one party is set free by the action of the other, the real matter for consideration is whether the acts or conduct of the one do or do not amount to an intimation of an intention to abandon and altogether to refuse performance of the contract. I say this in order to explain the ground upon which I think the decision in these cases must rest. There has been some conflict among them. But I think it may be taken that the fair result of them is as I have stated, viz., that the true question is whether the acts and conducts of the party evince an intention no longer to be bound by the contract. Now, nonpayment on the one hand, or nondelivery on the other, may amount to such an act, or may be evidence for a jury of an intention wholly to abandon the contract and set the other party free."

To the same effect are *Ex parte Chalmers*, L. R. 9 C. P. 289; *Morgan* v. *Bain*, L. R. 10 C. P. 15; and *Brandt* v. *Lawrence*

(in 1876), 1 Q. B. D. 344. In *Reuter* v. *Sala* (1879), 4 C. P. D. 239, the decision of the majority of the court favors the view of defendant; but the dissenting opinion of Lord Justice Brett is instructive. From *Simpson* v. *Crippin* and *Johnassohn* v. *Young* he makes this deduction: " It seems to me that the general principle to be deduced from these cases is, that where in a mercantile contract of purchase and sale of goods to be delivered and accepted the terms of the contract allow the delivery to be by successive deliveries, the failure of the seller or buyer to fulfil his part in any one or more of those deliveries does not absolve the other party from the duty of tendering or accepting in the case of other subsequent deliveries, although the contract was for the purchase and sale of a specified quantity of goods, and although the failure of the party suing as to one or more deliveries was incurable, in the sense that he never could fulfil his undertaking to accept or deliver the whole of the specified quantity. The reasons given are, that such a breach by the party suing is a breach of only a part of the consideration moving from him; that such a breach can be compensated in damages without any necessity for annulling the whole contract; that the true construction of such contracts is that it is not a condition precedent to the obligation to tender or accept a part; that the other party should have been or should be always ready, and willing, and able to accept or tender the whole." pp. 256, 257.

In *Honck* v. *Muller*, 7 Q. B. D. 92 (1881), Lord Justice Brett again maintained this view of the law. Finally, in 1884, the question was by the decision of the House of Lords in *Mersey Steel and Iron Co.* v. *Naylor*, 9 Q. B. D. 648; *S. C.* on appeal in the House of Lords, 9 App. Cas. 434, set at rest in England in accordance with the views which we contend for.

Among other things Lord Selborne said in that case: " I am content to take the rule as stated by Lord Coleridge in *Freeth* v. *Burr*, which is in substance, as I understand it, that you must look at the actual circumstances of the case in order to see whether the one party to the contract is relieved from its future performance by the conduct of the other; you must examine what that conduct is, so as to see whether it amounts to a re-

nunciation, to an absolute refusal to perform the contract, such as would amount to a rescission if he had the power to rescind, and whether the other party may accept it as a reason for not performing his part; and I think that nothing more is necessary in the present case than to look at the conduct of the parties, and see whether anything of that kind has taken place here. · . . . The contract is for the purchase of 5,000 tons of steel blooms of the company's manufacture; therefore it is one contract for the purchase of that quantity of steel blooms. No doubt there are subsidiary terms in the contract, as to the time of delivery, 'delivery 1,000 tons monthly commencing January next;' and as to the time of payment, 'payment net cash within three days after receipt of shipping documents;' but that does not split up the contract into as many contracts as there shall be deliveries for the purpose of so many distinct quantities of iron. It is quite consistent with the natural meaning of the contract, that it is to be one contract for the purchase of that quantity of iron to be delivered at those times and in that manner, and for which payment is so to be made. It is perfectly clear that no particular payment can be a condition precedent of the entire contract, because the delivery under the contract was most certainly to precede payment; and, that being so, I do not see how, without express words, it can possibly be made a condition precedent to the subsequent fulfilment of the unfulfilled part of the contract, by the delivery of the undelivered steel."

*Mr. Richard C. McMurtrie* for defendants in error, cited Benjamin on Sales, §§ 588, 759, 759*a*; Ib. Am. Ed. 1883, § 909*n*; *Reuter* v. *Sala*, 4 C. P. D. 239; *Bowes* v. *Shand*, 2 App. Cas. 455 (by Lord Blackburn, 480; by Lord Cairns, 463; by Lord Hatherly, 473); *Hochster* v. *De la Tour*, 2 El. & Bl. 678; *Walter* v. *Ginrich*, 2 Watts, 204; *Bushell* v. *Beavan*, 1 Bing. N. C. 103, 120; *Hallett* v. *Dowdal*, 18 Q. B. 281; *Kearney* v. *King*, 1 Chitty, 28; *Brandt* v. *Lawrence*, 1 Q. B. D. 344; *Mersey* v. *Naylor*, 9 App. Cas. 434; *Honck* v. *Muller*, 7 Q. B. D. 92; *Oxendale* v. *Wetherill*, 9 B. & C. 386; *Simpson* v. *Crippen*, L. R. 8 Q. B. 14; *Hoare* v. *Rennie*, 5 H. & N. 19;

*Pordage* v. *Cole*, 1 Wms. Saund., 6 Ed. 319*l*; *Behn* v. *Burness*, 3 B. & S. 755; *Graves* v. *Legg*, 9 Exch. 707, 709, 716; *Boone* v. *Ayre*, 1 H. Bl. as cited in 1 Saund., 320*d* (6th Ed.); *Campbell* v. *Jones*, 6 T. R. 576; *Martindale* v. *Smith*, 1 Q. B. 389; *Withers* v. *Reynolds*, 2 B. & Ad. 882; *Mayfield* v. *Wadsley*, 3 B. & C. 357, 365; *Canal Co.* v. *Gordon*, 6 Wall. 561; *King Philip Mills* v. *Slater*, 12 R. I. 82; *Etting Woollen Mills Co.* v. *Martin*, 5 Daly, 417; *Catlin* v. *Tobias*, 26 N. Y. 217; *Grant* v. *Johnson*, 1 Seld. 247, 252; *Dox* v. *Dey*, 3 Wend. 356, 361; *Hill* v. *Rewee*, 11 Met. (Mass.) 268; *Minnie* v. *Bradley*, 22 Pick. 457; *Raybold* v. *Voorhees*, 30 Penn. St. 116; *Miller* v. *Blessing*, Legal Intelligencer, Phila. (1884) 253; *Daniel* v. *Howard*, 30 Maine, 258; *Tyson* v. *Doe*, 15 Vermont, 571; *Fletcher* v. *Cole*, 23 Vermont, 114; *Preble* v. *Bottom*, 27 Vermont, 249; *Haines* v. *Tucker*, 50 N. H. 309; *Bradley* v. *King*, 44 Ill. 339; 2 Chitty Contracts, Am. Ed. 913*n*; Wharton on Contracts, § 580; *Borrowman* v. *Free*, 4 Q. B. D. 500; *Milldam Foundery* v. *Hovey*, 21 Pick. 417; *Weaver* v. *Sessions*, 6 Taunton, 155.

MR. JUSTICE GRAY delivered the opinion of the court. After stating the facts in the language reported above, he continued:

In the contracts of merchants, time is of the essence. The time of shipment is the usual and convenient means of fixing the probable time of arrival, with a view of providing funds to pay for the goods, or of fulfilling contracts with third persons. A statement descriptive of the subject-matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty, in the sense in which that term is used in insurance and maritime law, that is to say, a condition precedent, upon the failure or nonperformance of which the party aggrieved may repudiate the whole contract. *Behn* v. *Burness*, 3 B. & S. 751; *Bowes* v. *Shand*, 2 App. Cas. 455; *Lowber* v. *Bangs*, 2 Wall. 728; *Davison* v. *Von Lingen*, 113 U. S. 40.

The contract sued on is a single contract for the sale and purchase of 5,000 tons of iron rails, shipped from a European port or ports for Philadelphia. The subsidiary provisions as to

shipping in different months, and as· to paying for each shipment upon its delivery, do not split up the contract into as many contracts as there shall be shipments or deliveries of so many distinct quantities of iron. *Mersey Co.* v. *Naylor*, 9 App. Cas. 434, 439. The further provision, that the sellers shall not be compelled to replace any parcel lost after shipment, simply reduces, in the event of such a loss, the quantity to be delivered and paid for.

The times of shipment, as designated in the contract, are " at the rate of about 1,000 tons per month, beginning February, 1880, but whole contract to be shipped before August 1, 1880." These words are not satisfied by shipping one sixth part of the 5,000 tons, or about 833 tons, in each ·of the six months which begin with February and end with July. But they require about 1,000 tons to be shipped in each of the five months from February to June inclusive, and allow no more than slight and unimportant deficiencies in the shipments during those months to be made up in the month of July. The contract is not one for the sale of a specific lot of goods, identified·by independent circumstances, such as all those deposited in a certain warehouse, or to be shipped in a particular vessel, or that may be manufactured by the·seller, or may be required for use by the buyer, in a certain mill—in which case the mention of the quantity, accompanied by the qualification of " about," or " more or less," is regarded as a mere estimate of the probable amount, as to which good faith is all that is required of the party making it. But the contract before us comes within the general rule: "·When·no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations, arising from slight and unimportant ex·cesses or deficiencies in number, measure or weight." *Brawley* v. *United States*, 96 U. S. 168, 171, 172.

The seller is bound to deliver the quantity stipulated, and has no right either to compel the buyer to accept a less quan-

tity, or to require him to select part out of a greater quantity ; and when the goods are to be shipped in certain proportions monthly, the seller's failure to ship the required quantity in the first month gives the buyer the same right to rescind the whole contract, that he would have had if it had been agreed that all the goods should be delivered at once.

The plaintiff, instead of shipping about 1,000 tons in February and about 1000 tons in March, as stipulated in the contract, shipped only 400 tons in February, and 8ö5 tons in March. His failure to fulfil the contract on his part in respect to these first two instalments justified the defendants in rescinding the whole contract, provided they distinctly and seasonably asserted the right of rescission.

The defendants, immediately after the arrival of the March shipments, and as soon as they knew that the quantities which had been shipped in February and in March were less than the contract called for, clearly and positively asserted the right to rescind, if the law entitled them to do so. Their previous acceptance of the single cargo of 400 tons shipped in February was no waiver of this right, because it took place without notice, or means of knowledge, that the stipulated quantity had not been shipped in February. The price paid by them for that cargo being above the market value, the plaintiff suffered no injury by the omission of the defendants to return the iron; and no reliance was placed on that omission in the correspondence between the parties.

The case wholly differs from that of *Lyon* v. *Bertram*, 20 How. 149, in which the buyer of a specific lot of goods accepted and used part of them with full means of previously ascertaining whether they conformed to the contract.

The plaintiff, denying the defendants' right to rescind, and asserting that the contract was still in force, was bound to show such performance on his part as entitled him to demand performance on their part, and, having failed to do so, cannot maintain this action.

For these reasons, we are of opinion that the judgment below should be affirmed. But as much of the argument at the bar was devoted to a discussion of the recent English cases,

and as a diversity in the law, as administered on the two sides of the Atlantic, concerning the interpretation and effect of commercial contracts of this kind, is greatly to be deprecated, it is proper to add that upon a careful examination of the cases referred to they do not appear to us to establish any rule inconsistent with our conclusion.

In the leading case of *Hoare* v. *Rennie*, 5 H. & N. 19, which was an action upon a contract of sale of 667 tons of bar-iron, to be shipped from Sweden in June, July, August and September, and in about equal portions each month, at a certain price payable on delivery, the declaration alleged that the plaintiffs performed all things necessary to entitle them to have the contract performed by the defendants, and were ready and willing to perform the contract on their part, and in June shipped a certain portion of the iron, and within a reasonable time afterwards offered to deliver to the defendants the portion so shipped, but the defendants refused to receive it, and gave notice to the plaintiffs that they would not accept the rest. The defendants pleaded that the shipment in June was of about 20 tons only, and that the plaintiffs failed to complete the shipment for that month according to the contract. Upon demurrer to the pleas, it was argued for the plaintiffs that the shipment of about one fourth of the iron in each month was not a condition precedent, and that the defendants' only remedy for a failure to ship that quantity was by a cross action. But judgment was given for the defendants, Chief Baron Pollock saying: "The defendants refused to accept the first shipment, because, as they say, it was not a performance, but a breach of the contract. Where parties have made an agreement for themselves, the courts ought not-to make another for them. Here they say that in the events that have happened one fourth shall be shipped in each month, and we cannot say that they meant to accept any other quantity. At the outset, the plaintiffs failed to tender the quantity according to the contract; they tendered a much less quantity. The defendants had a right to say that this was no performance of the contract, and they were no more bound to accept the short quantity than if a single delivery had been contracted for. There-

fore the pleas are an answer to the action." 5 H. & N. 28.
So in *Coddington* v. *Paleologo*, L. R. 2 Ex. 193, while there
was a division of opinion upon the question whether a contract
to supply goods "delivering on April 17, complete 8th May,"
bound the seller to begin delivering on April 17, all the
judges agreed that if it did, and the seller made no delivery on
that day, the buyer might rescind the contract.

On the other hand, in *Simpson* v. *Crippin*, L. R. 8 Q. B. 14,
under a contract to supply from 6,000 to 8,000 tons of coal, to
be taken by the buyer's wagons from the seller's colliery in
equal monthly quantities for twelve months, the buyer sent
wagons for only 150 tons during the first month; and it was
held that this did not entitle the seller to annul the contract
and decline to deliver any more coal, but that his only remedy
was by an action for damages. And in *Brandt* v. *Lawrence*,
1 Q. B. D. 344, in which the contract was for the purchase of
4,500 quarters, ten per cent. more or less, of Russian oats,
"shipment by steamer or steamers during February," or, in
case of ice preventing shipment, then immediately upon the
opening of navigation, and 1,139 quarters were shipped by one
steamer in time, and 3,361 quarters were shipped too late, it was
held that the buyer was bound to accept the 1,139 quarters,
and was liable to an action by the seller for refusing to accept
them.

Such being the condition of the law of England as declared
in the lower courts, the case of *Bowes* v. *Shand*, after conflict-
ing decisions in the Queen's Bench Division and the Court of
Appeal, was finally determined by the House of Lords. 1 Q.
B. D. 470; 2 Q. B. D. 112; 2 App. Cas. 455.

In that case, two contracts were made in London, each for
the sale of 300 tons of "Madras rice, to be shipped at Madras
or coast, for this port, during the months of March $^{and}_{or}$ April,
1874, per Rajah of Cochin." The 600 tons filled 8,200 bags,
of which 7,120 bags were put on board and bills of lading
signed in February; and for the rest, consisting of 1,030 bags
put on board in February, and 50 in March, the bill of lading
was signed in March. At the trial of an action by the seller
against the buyer for refusing to accept the cargo, evidence

was given that rice shipped in February would be the spring crop, and quite as good as rice shipped in March or April. Yet the House of Lords held that the action could not be maintained, because the meaning of the contract, as apparent upon its face, was that all the rice must be put on board in March and April, or in one of those months.

In the opinions there delivered the general principles underlying this class of cases are most clearly and satisfactorily stated. It will be sufficient to quote a few passages from two of those opinions.

Lord Chancellor Cairns said: "It does not appear to me to be a question for your Lordships, or for any court, to consider whether that is a contract which bears upon the face of it some reason, some explanation, why it was made in that form, and why the stipulation is made that the shipment should be during these particular months. It is a mercantile contract, and merchants are not in the habit of placing upon their contracts stipulations to which they do not attach some value and importance." 2 App. Cas. 463. "If it be admitted that the literal meaning would imply that the whole quantity must be put on board during a specified time, it is no answer to that literal meaning, it is no observation which can dispose of, or get rid of, or displace, that literal meaning, to say that it puts an additional burden on the seller, without a corresponding benefit to the purchaser; that is a matter of which the seller and the purchaser are the best judges. Nor is it any reason for saying that it would be a means by which purchasers, without any real cause, would frequently obtain an excuse for rejecting contracts when prices had dropped. The nonfulfilment of any term in any contract is a means by which a purchaser is able to get rid of the contract when prices have dropped; but that is no reason why a term which is found in a contract should not be fulfilled." pp. 465, 466. "It was suggested that even if the construction of the contract be as I have stated, still if the rice was not put on board in the particular months, that would not be a reason which would justify the appellants in having rejected the rice altogether, but that it might afford a ground for a cross action by them if they could show that any particu-

lar damage resulted to them from the rice not having been put on board in the months in question. My Lords, I cannot think that there is any foundation whatever for that argument. If the construction of the contract be as I have said, that it bears that the rice is to be put on board in the months in question, that is part of the description of the subject-matter of what is sold. What is sold is not 300 tons of rice in gross or in general. It is 300 tons of Madras rice to be put on board at Madras during the particular months." " The plaintiff, who sues upon that contract, has not launched his case until he has shown that he has tendered that thing which has been contracted for, and if he is unable to show that, he cannot claim any damages for the nonfulfilment of the contract." pp. 467, 468.

Lord Blackburn said : " If the description of the article tendered is different in any respect, it is not the article bargained for, and the other party is not bound to take it. I think in this case what the parties bargained for was rice, shipped at Madras or the coast of Madras. Equally good rice might have been shipped a little to the north or a little to the south of the coast of Madras. I do not quite know what the boundary is, and probably equally good rice might have been shipped in February as was shipped in March, or equally good rice might have been shipped in May as was shipped in April, and I dare say equally good rice might have been put on board another ship as that which was put on board the Rajah of Cochin. But the parties have chosen, for reasons best known to themselves, to say : We bargain to take rice, shipped in this particular region, at that particular time, on board that particular ship ; and before the defendants can be compelled to take anything in fulfilment of that contract it must be shown not merely that it is equally good, but that it is the same article as they have bargained for— otherwise they are not bound to take it." 2 App. Cas. 480, 481.

Soon after that decision of the House of Lords, two cases were determined in the Court of Appeal. In *Reuter* v. *Sala*, 4 C. P. D. 239, under a contract for the sale of " about twenty-five tons (more or less) black pepper, October $\frac{and}{or}$ November

shipment, from Penang to London, the name of the vessel or vessels, marks and full particulars to be declared to the buyer in writing within sixty days from date of bill of lading," the seller, within the sixty days, declared twenty-five tons by a particular vessel, of which only twenty tons were shipped in November, and five tons in December; and it was held that the buyer had the right to refuse to receive any part of the pepper. In *Honck* v. *Muller*, 7 Q. B. D. 92, under a contract for the sale of 2,000 tons of pig iron, to be delivered to the buyer free on board at the maker's wharf "in November, or equally over November, December and January next," the buyer failed to take any iron in November, but demanded delivery of one third in December and one third in January; and it was held that the seller was justified in refusing to deliver, and in giving notice to the buyer that he considered the contract as cancelled by the buyer's not taking any iron in November.

The plaintiff in the case at bar greatly relied on the very recent decision of the House of Lords in *Mersey Co.* v. *Naylor*, 9 App. Cas. 434, affirming the judgment of the Court of Appeal in 9 Q B. D. 648, and following the decision of the Court of Common Pleas in *Freeth* v. *Burr*, L. R. 9 C. P. 208.

But the point there decided was that the failure of the buyer to pay for the first instalment of the goods upon delivery does not, unless the circumstances evince an intention on his part to be no longer bound by the contract, entitle the seller to rescind the contract and to decline to make further deliveries under it. And the grounds of the decision, as stated by Lord Chancellor Selborne in moving judgment in the House of Lords, are applicable only to the case of a failure of the buyer to pay for, and not to that of a failure of the seller to deliver, the first instalment.

The Lord Chancellor said: "The contract is for the purchase of 5,000 tons of steel blooms of the company's manufacture; therefore it is one contract for the purchase of that quantity of steel blooms. No doubt there are subsidiary terms in the contract, as to the time of delivery, 'Delivery 1,000 tons monthly commencing January next;' and as to the time of

payment, 'Payment nett cash within three days after receipt of shipping documents;' but that does not split up the contract into as many contracts as there shall be deliveries for the purpose, of so many distinct quantities of iron. It is quite consistent with the natural meaning of the contract, that it is to be one contract for the purchase of that quantity of iron to be delivered at those times and in that manner, and for which payment is so to be made. It is perfectly clear that no particular payment can be a condition precedent of the entire contract, because the delivery under the contract was most certainly to precede payment; and that being so, I do not see how, without express words, it can possibly be made a condition precedent to the subsequent fulfilment of the unfulfilled part of the contract, by the delivery of the undelivered steel." 9 App. Cas. 439.

Moreover, although in the Court of Appeal *dicta* were uttered tending to approve the decision in *Simpson* v. *Crippin*, and to disparage the decisions in *Hoare* v. *Rennie* and *Honck* v. *Muller*, above cited, yet in the House of Lords *Simpson* v. *Crippin* was not even referred to, and Lord Blackburn, who had given the leading opinion in that case, as well as Lord Bramwell, who had delivered the leading opinion in *Honck* v. *Muller*, distinguished *Hoare* v. *Rennie* and *Honck* v. *Muller* from the case in judgment. 9 App. Cas. 444, 446.

Upon a review of the English decisions, the rule laid down in the earlier cases of *Hoare* v. *Rennie* and *Coddington* v. *Paleologo*, as well as in the later cases of *Reuter* v. *Sala* and *Honck* v. *Muller*, appears to us to be supported by a greater weight of authority than the rule stated in the intermediate cases of *Simpson* v. *Crippin* and *Brandt* v. *Lawrence*, and to accord better with the general principles affirmed by the House of Lords in *Bowes* v. *Shand*, while it in nowise contravenes the decision of that tribunal in *Mersey Co.* v. *Naylor*.

In this country, there is less judicial authority upon the question. The two cases most nearly in point, that have come to our notice, are *Hill* v. *Blake*, 97 N. Y. 216, which accords with *Bowes* v. *Shand*, and *King Philip Mills* v. *Slater*, 12 R. I. 82, which approves and follows *Hoare* v. *Rennie*. The recent

cases in the Supreme Court of Pennsylvania, cited at the bar, support no other conclusion. In *Shinn* v. *Bodine*, 60 Penn. St. 182, the point decided was that a contract for the purchase of 800 tons of coal at a certain price per ton, " coal to be delivered on board vessels as sent for during months of August and September," was an entire contract, under which nothing was payable until delivery of the whole, and therefore the seller had no right to rescind the contract upon a refusal to pay for one cargo before that time. In *Morgan* v. *McKee*, 77 Penn. St. 228, and in *Scott* v. *Kittanning Coal Co.*, 89 Penn. St. 231, the buyer's right to rescind the whole contract upon the failure of the seller to deliver one instalment was denied, only because that right had been waived, in the one case by unreasonable delay in asserting it, and in the other by having accepted, paid for and used a previous instalment of the goods. The decision of the Supreme Judicial Court of Massachusetts in *Winchester* v. *Newton*, 2 Allen, 492, resembles that of the House of Lords in *Mersey Co.* v. *Naylor*.

Being of opinion that the plaintiff's failure to make such shipments in February and March as the contract required prevents his maintaining this action, it is needless to dwell upon the further objection that the shipments in April did not comply with the contract, because the defendants could not be compelled to take about 1,000 tons out of the larger quantity shipped in that month, and the plaintiff, after once designating the names of vessels, as the contract bound him to do, could not substitute other vessels. See *Busk* v. *Spence*, 4 Camp. 329; *Graves* v. *Legg*, 9 Exch. 709; *Reuter* v. *Sala*, above cited.

*Judgment affirmed.*

The CHIEF JUSTICE was not present at the argument, and took no part in the decision of this case.