(36 App. Div. 167.)

## BROWNE v. PATERSON et al.

(Supreme Court, Appellate Division, First Department. January 20, 1899.)

SALE —FAILURE TO DELIVER—RIGHT TO RESCIND.

A cargo of nitrate was "bought to be a March and or April shipment from west coast, South America, also bought to test by South American assay." The seller had purchased nitrate to fill the order, but it was not all to be delivered at port of loading before the end of April, and had chartered a vessel which was not to be at the port before March 15th. The buyer knew when signing the contract that the vessel was not in port, but did not know when it was expected, and did not know that the seller did not have sufficient nitrate to fill the order in April. *Held*, that the provision for "March and or April shipment" was a condition precedent, authorizing the buyer to rescind, the vessel not sailing until after April.

Appeal from judgment on report of referee.

Action by T. Quincy Browne against Robert W. Paterson and others. There was a judgment for plaintiff, and defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Charles E. Rushmore, for appellants.

John S. Melcher, for respondent.

RUMSEY, J. The firm of Hemenway & Browne, of which the plaintiff is the survivor, and the firm of Knudson, Paterson & Co., were, in 1889, dealers in nitrate, imported from the west coast of South America. On the 19th of February, the two firms entered into a contract in writing, of which the following is a copy:

"Boston, February 19th, 1889.

"Sold to Messrs. Knudson, Paterson & Co., for account of Messrs. Hemenway & Browne, one-half of the cargo per 'Wachusett' chartered to load not exceeding twenty-two hundred (2,200) tons, usual good, merchantable quality nitrate of soda to arrive at New York, bought to be a March and or April, 1889, shipment, from west coast, South America, also bought to test by South American assay not under 96 per cent. nitrate, nor over 1¼ per cent. salt; if of inferior test, sellers to allow full coast allowance received. Price, two and one-twentieth (2¹/₂₀) cents per pound, payable in gold or its equivalent, cash in thirty (30) days from average delivery. Deliverable in good order, in single bags, as landed ex-vessel in New York. Actual weight and 1½ per cent. tare. No arrival, no sale. No responsibility taken unless by special agreement.

"T. F. Edmands & Co., Brokers."

On the margin of the contract is written the following:

"Should vessel named in this contract be lost before reaching loading ports, another vessel or vessels to be substituted for same shipment, or as near thereto as practicable."

On the next day another contract was made, for the sale of the other half of the same cargo, but otherwise identical in every respect except as to the date. The defendants claim that, pursuant to the terms of those contracts, the nitrate was to be a "March and or April" shipment. None of it was shipped until the 30th day of April, at which time a small quantity was put on board the vessel. The remainder was shipped from time to time until the 17th of June, when the loading was complete. On the 4th of June,

the defendants, having learned that the nitrate was not shipped in March or April, notified the plaintiffs that they refused to receive it, upon the ground that it was not shipped within the time required by the contract. The goods reached the port of New York on the 31st day of December, 1889, and were tendered by the sellers to the buyers, who refused to receive them, for the reasons stated above. Thereupon they were stored by the sellers, and subsequently sold for account of the buyers. As the result of the sale, there was a considerable loss, which this action was brought to recover. The defense was put upon the ground that the words in the contract, "bought to be a March, and or April, 1889, shipment, from west coast, South America," constituted a condition precedent; and, as that condition was not complied with, the defendants were not required to receive the goods. The plaintiffs contended that the words quoted were mere words of description, and did not require them to cause the goods to be shipped in the months of March or April. Their contention was adopted by the learned referee, who subsequently directed a judgment to be entered in their favor for the amount of the loss, and from that judgment this appeal is taken.

The question, although an important one, is within a narrow compass. It requires simply the construction of the words of the contract which are quoted. The referee held that the phrase including the word "bought" had not acquired any fixed meaning by commercial usage, and in that matter we agree with him. We must then refer to the contract alone to ascertain its construction. In construing contracts of this kind, the circumstances under which the contract was made, the manner of dealing in the business so far as it was known to both parties, and the purpose for which the contract was made, are to be considered. Behn v. Burness, 3 Best & S. 751, 757; Lowber v. Bangs, 2 Wall. 728. It is a mercantile contract, and, in getting at the construction of it, it must be remembered that merchants are not in the habit of putting into such contracts stipulations to which they do not attach some value and importance. Bowes v. Shand, 2 App. Cas. 455, 463.

The contracts were made on the 19th and 20th of February, 1889. The plaintiff's firm were large importers of nitrate, and contracts for the sale of that commodity here were based upon contracts for the purchase of it in Chile, where it was principally produced. Sometimes these contracts for purchase there were made before the contracts for sale here, and sometimes the contracts for sale here were made before the purchases there; but in all cases the contracts here were based upon purchases made or to be made there. In this particular case it appears that the firm of Hemenway & Browne had made a contract on the 9th of February, 1889, for the purchase of 45,000 quintals of nitrate, to be delivered at the port of Caleta Buena, in Chile, in two months from the 1st of March, that they had made another contract on the 12th of that month, for 85,000 quintals, to be delivered at the same port in two months from the 1st of April. The defendants, however, had no notice of the making of these contracts, so far as appears. Hemenway &

Browne, having received notice of these contracts by telegram, chartered the ship Wachusett on the 13th of February, to proceed to the port of Caleta Buena, and take on board 2,200 tons of nitrate to be transported to the United States. By the terms of the contract, the ship was to reach Caleta Buena, and begin loading, not before March 15th. When this charter party was made, the Wachusett was at the port of Coquimbo, in Chile, which, it appears, was about 14 days sail from Caleta Buena. The fact that the ship was at that port, discharging a cargo, and in a general way the time required to proceed from Coquimbo to Caleta Buena, were known to the plaintiff's firm at the time the charter party was made. All that was known on that subject by the defendants was that the Wachusett was not at the loading port at the time when they contracted to buy the nitrate of the plaintiff's firm; but what her precise situation was, or when she would probably be at the port where she was to take on board the nitrate, does not appear to have been communicated to them. As a matter of fact, the Wachusett, at the time the charter party was made, was discharging a cargo at Coquimbo, under a contract by which she was not to discharge more than 40 tons daily; and she was not able to sail from that port to Caleta Buena until the 9th of April, 1889. It does not appear, however, that the plaintiff's firm was aware of the conditions under which she was discharging at Coquimbo, and there is no pretense that the defendants knew any more about it than that she was not at that time at the port of delivery, ready to receive her cargo of nitrate. The full cargo of the Wachusett, and the amount which was sold by the plaintiff's firm to the defendants, was 2,200 tons; English weight, 2,240 pounds each; or, in all, 49,280 quintals. By the first contract which the plaintiff's firm made to buy nitrate for delivery on board the Wachusett, they contracted to purchase not exceeding 46,000 quintals, which was not quite enough in quantity to complete the loading of the ship. This was all the nitrate they had purchased, which was necessarily to be received by them under their contracts for March or April. Under the contract of the 12th of February, they bought 85,000 quintals of nitrate, to be delivered in April or May; so that, as a matter of fact, the plaintiff's firm, at the time of making the contract with the defendants, did not have under contract a sufficient amount of nitrate which was necessarily a "March and or April" shipment to load the Wachusett in full, although they made contracts from which they might possibly expect that they would have on hand before the end of April sufficient nitrate to load the ship.

These were the circumstances, so far as they are made to appear by the evidence, which surrounded the transaction when it was made. It does not appear, however, that any information was given to the defendants as to the manner in which the plaintiff's firm became possessed of the nitrate, or as to the nature of the contracts which they had made for its delivery to them at the port where it was to be shipped. Those being the circumstances under which the contracts were made, they were entered into on the 19th and 20th of February, 1889. The purpose for which they were made was plainly to enable

the parties who were making the contract to know precisely what their relative rights against each other were.    It was of no importance to either of them to know what contracts the other had made with third parties; but the object of this contract was to fix the rights of the parties as between themselves, and we may fairly assume that they had in mind to make such stipulations with regard to the quantity and quality of goods to be purchased, the time and place of delivery, and the price to be paid, as would enable the parties to this contract, by a reference to it, to know precisely their relative rights in those respects.    It would not seem to have been important to the defendants to know how the plaintiff's firm became the owners of this nitrate, or when it was to be delivered to them, that they might ship it to the defendants, but only when the nitrate was to be shipped on the Wachusett at the port of delivery, in order that they might be able to make some calculation upon the probable time of delivery to them in this country, so that they might arrange for their payments, and contract for sales of the nitrate when it was to arrive.    The words in the contract "to be a March and or April, 1889, shipment," standing by themselves, amount to a warranty or condition precedent that the articles sold shall be shipped on board the Wachusett during the months of March or April, and that the shipment shall be complete by the end of the latter month.    Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12; Hill v. Blake, 97 N. Y. 216; Bowes v. Shand, 2 App. Cas. 455; Ledon v. Havemeyer, 121 N. Y. 179, 24 N. E. 297.    But the plaintiff claims that these words are qualified by the use of the word "bought" before them, and that that word refers to the purchase by his firm, and is a mere description of the nitrate which they had purchased; so that the words, taken together, do not constitute a condition precedent.    Whether that contention is correct is the sole question presented by this appeal.

Referring to the contract, we find that it is a bought and sold note, the plaintiff's firm being the sellers, and the defendants the buyers. Ordinarily, in such papers the word "sold" refers to the sellers, and the word "bought" refers to the buyers; but the plaintiff claims that the words are not used in that connection in this contract.    It is conceded that the nitrate was to be shipped from west coast of South America, and it is very clear from all of the circumstances of the case that the plaintiff's firm could not have performed their contract by shipping to the defendants upon the Wachusett nitrate from any other port than one on that coast.    But the word "bought" refers as much to the place of shipment as it does to the time of shipment.    The words are "bought to be a March and or April, 1889, shipment, from west coast, South America."    Under that contract there can be no doubt that the defendants had the right to claim that the nitrate should be shipped to them from the west coast of South America, and that is conceded by the plaintiff.    But they obtained that right by the same phrase used in the same connection as they obtained a right to have the nitrate shipped at any particular time.    If, therefore, the word "bought" limits the place from which the nitrate was to be shipped, so that it became a condition precedent that it was to be shipped from the west coast of South America, it must have the same

construction when applied to the time of shipment. If the word refers to the purchase by the plaintiff's firm, then it is not strictly true, for the nitrate which was to be shipped upon the Wachusett was not all bought to be a "March and or April" shipment, but a portion of it—a small portion, it is true—was bought to be an April and or May shipment. This fact, though slight in itself, is a thing to be taken into consideration in the construction of the contract. By the express terms of the contract, the goods were to be shipped on board the Wachusett; and there can be no doubt that the shipment upon that vessel was a condition precedent. We find upon the side of the contract a marginal note, by which it is stated: "Should the vessel named in this contract be lost before reaching loading ports, another vessel or vessels to be substituted for same shipment, or as near thereto as practicable." This provision of the contract was clearly inserted for the benefit of the sellers. But for that provision, they would not be at liberty to ship on board any vessel but the Wachusett; and, if that ship had been lost before or after the cargo was delivered, "the contract would have been at an end." In the provision, which was made for their benefit, it is quite noticeable that they are permitted to substitute another vessel for the same shipment, or as near the one provided for by the contract as practicable. The words "as near thereto as practicable," used in that marginal note, clearly refer to time, and just as clearly they refer to the time of the shipment to be made pursuant to this contract, by way of delivery to the defendants. That being their meaning, the word "thereto" must necessarily refer to some time mentioned in the contract as the time of delivery in performance of it. Unless it does so refer, it is clearly without meaning. No time is mentioned in the contract by way of performance of it, except the "March and or April shipment"; and, unless the word "thereto" refers to that shipment, it can have no meaning whatever with reference to the contract. It must be assumed, however, that every word in this contract has some meaning; and if we give any meaning to the word "thereto," used in that marginal note, it must be that the substituted shipment made necessary by the loss of the Wachusett shall be as near as practicable in time to the shipment that was to have been made by the Wachusett, and that was a shipment made in "March and or April." It is clear that the words "as near thereto as practicable" cannot refer to the time when the goods were bought by the plaintiff's firm, because that had already been done. They must refer to something which was to be done in the future, in the performance of this contract, and that, necessarily, was the shipment which was to be made under its terms. If the plaintiff's firm was not limited as to the time of the shipment by the contract, they might, of course, under this permission in case of the loss of the Wachusett, have substituted another ship in its place within a reasonable time, and there would have been no necessity of limiting their right by the words in the marginal note. The fact that those words are there can produce no other result than to satisfy us that they refer to a time of shipment provided for in the contract, by the Wachusett, and to require the plaintiff's firm to exercise their right of a substituted shipment in case it becomes necessary to do so, as quickly as may be prac-

ticable.  In view of the use of those words in that marginal note, we are utterly unable to see how the provision of the contract requiring a March or April shipment can be construed otherwise than as a reference to the time of shipment of the goods for the purposes of delivery to the defendants.

But it is said that the fact that defendants consented that, if the Wachusett should be lost, another vessel might be substituted, shows that the stipulation that the shipment was to be made in March or April was not so vital as to be construed as a condition precedent. We cannot so construe it.  The marginal clause was made to keep the contract alive in case it proved impossible to ship the goods in the ship named.  But the new shipment was limited to time as carefully as the original one.  That this was done shows that the time of shipment was regarded as material.  It was limited by the words "as near thereto as practicable," as closely as it could be in view of the uncertainty when another vessel could be obtained.  The time would have to be extended if the contingency arose; but it was extended for no longer than was absolutely necessary.  The element of time in making the substituted shipment was retained, and there cannot be spelled out from the provisions in that regard any intention to abandon the condition precedent which otherwise existed with regard to the shipment by the Wachusett, or to weaken its force.  If the goods were loaded on the Wachusett, the loading must be completed in April. If that ship should be lost, and another one provided, yet the shipment must be made as quickly as practicable.  All through the importance of the time of the shipment is apparent.

The word "bought," however, is used a second time in this contract. It is said, after the words quoted above, "also bought to test by South American assay, not under 96 per cent. nitrate, nor over $1\frac{1}{4}$ per cent. salt, if of inferior test, sellers to allow full coast allowance received." There can be no doubt that this phrase fixes the quality of the nitrate which was sold by the plaintiff's firm to the defendants, and entitled the defendants to insist that the goods shall assay not under 96 per cent. nitrate, and that, if they assay less, the defendants shall receive the same allowance which the custom of the trade warrants to the sellers.  That this is the proper construction of this phrase is conceded by the plaintiff in his testimony; and, if it were not so conceded, it is perfectly evident that it operates as such a warranty, because it assures to the buyers an allowance which has been provided for in some previous contract, or by the custom of the trade to the sellers for the failure to assay 96 per cent.  It is a familiar rule of construction of a contract that, where the same word is used more than once in it, it is to receive the same meaning wherever it occurs, if that is practicable.  There is no reason to suppose that the word "bought" is used in this contract in two different senses.  It is just as important for the defendants to know how the nitrate was to be shipped as it is to know its quality when shipped; and if the word "bought," used with reference to the quality, refers to the purchasers under this contract, it is just as clear, as it seems to us, that the same word, used with reference to the time and place of shipment, refers to the same persons.

For these reasons, we are of the opinion 'that the learned referee erred in his construction of the contract, and that he should have held that the words referred to constituted a condition precedent, and that the failure of the plaintiff's firm to cause the goods to be shipped during the months of March or April was a violation of the contract, and deprived them of any right to damages for a refusal of the defendants to perform. These considerations require us to reverse the judgment, and to order a new trial before another referee, with costs to the appellants to abide the event of the action. All concur.