J. C. FAMECHON, Appellant, v. HENRY I. DEVORE, Respondent.

Springfield Court of Appeals, November 5, 1914.

1. **SALES: Breach of Contract of: Delivering Excess Quantity: Compliance with Contract.** Action to recover damages for failure of defendant to accept a car of onions. Plaintiff accepted defendant's offer to purchase a "lightest minimum car of on-

184 Mo. App.—37

ions," but overloaded the car 4000 pounds. Defendant refused to accept car. Whereupon an offer was made by plaintiff to reduce the quantity to the amount ordered and the draft correspondingly, but did not offer to reduce the freight on the excess. Plaintiff did not substantially comply with his agreement and hence cannot recover damages. (STURGIS, J., dissenting.)

2. ————: **Excess Delivery by Seller: Buyer Excused.** When a seller in filing an order sends more goods than the buyer has ordered, the buyer is under no legal obligations to accept any part of the goods.

Appeal from Greene County Circuit Court.—*Hon. Guy D. Kirby*, Judge.

AFFIRMED (STURGIS, J., *Dissenting*).

*A. W. Lyon* for appellant.

The position taken by the trial judge, on which he bases his judgment, is wholly untenable. When appellant offered to take out the extra weight, as soon as he could ascertain respondent's reason for the refusal, and to reduce the draft, he complied strictly with every condition of his contract. The general offer to reduce the draft covered the little detail or item of the freight on the overage. That item was not thought of by respondent and was not taken into account by him in the rejection. The broad, general offer to reduce the draft under all the circumstances was certainly sufficient, and there was no necessity for a detailed or itemized offer.

*M. C. Smith* for respondent.

The specification of a given quantity under an agreement is always regarded as a material element in every contract of sale; and the failure of the seller to deliver the quantity specified constitutes a total breach of the contract, and the buyer is justified in refusing to accept goods which are not tendered in

accordance with the provisions of his contract. 24 Am. & Eng. Ency. of Law (2 Ed.), page 1092, sec. 3; 35 Cyc., page 204; Rommel v. Wingate, 103 Mass. 327; Tiedeman on Sales, sec. 10, page 147, edition 1891; Perry v. Mount Hope Iron Co., 15 Atl. 87; Browning v. East Point Milling Co., 74 S. E. 74; Landesman v. Gummersell, 16 Mo. App. 459; Clothing Co. v. Singleton, 161 Mo. App. 161.

ROBERTSON, P. J.—Plaintiff sued to recover damages for failure of defendant to accept a car of onions. A trial to the court resulted in a judgment for defendant from which plaintiff appeals. A finding of facts was made by the trial court to which neither side objects. The material part of the testimony is documentary and uncontradicted oral evidence, so that there are only conclusions of law to be drawn therefrom. The defendant ordered from plaintiff, a produce merchant at Minneapolis, 250 crates of a designated kind of onion and enough additional of another kind to make "lightest minimum car." The car was loaded by a representative of plaintiff in Texas with 494 crates, an excess in weight of over 4000 pounds, and shipped to defendant at Springfield, Mo. A draft was drawn on defendant and sent to a bank there with bill of lading, consigning the car to plaintiff, attached covering the value of the entire shipment and freight which the defendant was to pay. Before ordering the car defendant inquired of the railroad officials and learned that a minimum car was 24000 pounds, which the plaintiff also well understood. When the car arrived he learned of its excessive load above the minimum and immediately telegraphed plaintiff: "Can't use car of onions." The plaintiff sought to have defendant state more explicitly his reasons for refusal, but failing, a few days later had him interviewed personally when defendant gave as his reason the excessive quantity. The plaintiff then offered to reduce

quantity and draft to the original order, but said nothing about the freight on the excess weight amounting to over $20. The defendant shipped the onions to Duluth and there sold them at a loss which he now seeks to recover.

The trial court gave good reasons for the judgment; that the plaintiff did not fulfill or offer to fulfill his contract, and that in offering to retake excess and reduce draft accordingly nothing was said about freight on the excess and hence, this was not an offer even then to comply with contract. ''When the seller in filling an order sends more goods than the buyer has ordered, the buyer is under no legal obligation to accept any part of the goods.'' [Lanesman v. Gumersell, 16 Mo. App. 459, 460 and Ruhl Clothing Co. v. Singleton, 161 Mo. App. 366, 371, 143 S. W. 529.] The defendant did not receive the shipment, hence it was not incumbent on him to offer to return it or to notify the plaintiff that he held the same subject to his order, because he did not. The only thing that can be said is that he might have been more explicit in his advice to the plaintiff that he would not accept the car, but the statement that he could not use the onions should have been as impressive on the plaintiff, who knew he had overloaded the car more than 4000 pounds, as if defendant had stated he would not use or accept same. The plaintiff testified as follows: ''As far as the minimum between buyer and seller is concerned, there is a little liberality shown and we never have any objection given to a little over the minimum except when market conditions are weak and they wish to make that a technical excuse for rejection.'' He, therefore, must have known that when the excess was so much more than ''a little over the minimum'' objections would be made. It is intimated by plaintiff that defendant's real excuse for not accepting the shipment was on account of a declining market, but this might be suggested as a reason for plaintiff overloading the car.

Plaintiff agreed to ship a minimum car and with this agreement he did not substantially comply in making the shipment, or in his subsequent efforts to adjust the matter.

The judgment is affirmed.

*Farrington, J.,* concurs. *Sturgis, J.,* dissents and files separate opinion.

## CONCURRING OPINION.

FARRINGTON, J.—For my purpose the facts are sufficiently stated in the opinions of my associates and need not again be set forth except as they enter into and form a part of the discussion. It is because a dissenting opinion has been prepared that I desire to support the affirmance of the judgment in a separate opinion.

There are certain duties that courtesy require; certain others that politeness require; and many that are required as moral duties. But in the relations existing between or among individuals, courts cannot enforce judgments and take money from one and give it to another for a breach of any such duties unless the duty in question is one recognized as also a legal duty. With this kept in mind, I think the question for determination is easy of solution.

I shall first consider the cases cited in the dissenting opinion and distinguish them from the case at bar.

The case of Pierson et al. v. Crooks et al., 115 N. Y. 539, quoted from in the dissenting opinion, discloses on examination that the questions reviewed were entirely different from the question here involved. There, the purchaser received the goods and was suing to recover from the seller the amount paid together with his damages because of defective quality. The questions raised, as shown on page 546 of the report, were (1) as to where the inspection must take place;

(2) as to the time within which a buyer must act; and
(3) whether merely receiving was an acceptance.

In our case there is no claim that defendant did not act quickly enough because he did notify plaintiff on the very day that the invoice, and draft .with bill of lading attached reached Springfield, and though he might have gone and looked at the car (probably to inspect as to quality) on the fifteenth of the month, he could not be held to a knowledge that there was 4158 pounds in excess until he received the invoice and bill of lading disclosing that fact.

In the New York case, supra, the court merely held, and rightly so, that a plaintiff who was a buyer could recover from a defendant who was a seller where the buyer had fulfilled all the duties of a buyer and when the seller had breached his contract.

But here we have a seller who admits that he breached his contract as to quantity, where quantity was a material element in the procuring of the contract; nevertheless, in the face of that breach on his part, he as plaintiff asks that he be permitted to make the buyer perform his side of the contract just as though the plaintiff had actually substantially fulfilled his agreement. The very reason why the plaintiff was permitted to recover in the New York case is the one that prevents the plaintiff's recovery here. Before a plaintiff can recover for a defendant's breach he must show that he (plaintiff) has performed or tendered a performance.

The question under discussion in the case of Pierce Steam Heating Co. v. Siegel Gas Fixture Co., 60 Mo. App. 148, was as to the necessity of a rejection and the time within which the buyer must make it.

The defendant in our case certainly acted hastily enough as he sent a telegram to the plaintiff on the first day that the papers came to him advising him of the number of pounds shipped. No one would expect him, between the 15th and 18th of the month, to

unload the car (which he had no right to do until he paid the draft) and to weigh the onions and ascertain there was 4158 pounds excess. He had no cause to believe there was more than he ordered until he received the invoice and bill of lading, and, as before stated, on that very day he did give plaintiff this information by telegraph: ''Can't use car onions.'' It is true this telegram was indefinite in some respects, but it was equally certain in another; it was indefinite as to why he could not use the onions, but was very plain in expressing the notice that the car was rejected—as much so as if he had wired, ''Car rejected.'' I find nothing in the authorities, where the quantity tendered is greater or less than called for in the contract, requiring anything more than a rejection, or a refusal to accept. This is sufficient to give the seller an opportunity to minimize the loss—which is the reason some notice of rejection is required. But in our case it is doubtful if plaintiff was entitled to any notice because he already knew that more onions than was contracted for had been shipped, as an invoice had been made up by plaintiff and a draft drawn by him showing that there were 70 crates or 4158 pounds more than defendant had agreed to buy; hence plaintiff already had sufficient knowledge of one reason for a rejection—which proved to be the real objection.

The case of Sutton v. Risser (Iowa), 74 N. W. 23, and that of Knox v. Schoenthal, 13 N. Y. Supp. 7, are not authorities applicable here, for in those two cases the buyer in rejecting gave one reason which on the trial was abandoned as a defense and another set up in the answer instead, and the holding correctly sustained the view that the buyer, having given a reason must stand or fall with it, and that having given one was a waiver of all others which would estop the buyer from setting up any other.

A distinction must be borne in mind between those cases where the goods are received by and are in the

buyer's keeping and control and the cases where the goods are never in the buyer's possession or keeping or under his control.

The bill of lading in our case was accompanied by a sight draft which had to be paid before the title or control of the goods ever passed out of the seller. [See Burgess v. Railroad, 176 Mo. App. 257, 161 S. W. 858.]

Another point to be considered in connection with the cases involving the question before us: Where the buyer does some act, or in giving some reason for rejection, misleads the seller and causes him to do something or refrain from doing something to protect himself, the buyer may become bound. But in our case there is no showing whatever that "Can't use car onions" misled the plaintiff in the least or caused him to change his course of dealing to his damage.

The case of Landesman v. Gumersell, 16 Mo. App. 459, cited as an authority for reversing this judgment, is, on the contrary, a very strong authority for affirming it. The cause of action there against the buyer, as shown by the last half of the last page of the opinion, was not to require him to pay damages for refusing to comply with his contract which the seller had also breached, but liability was put on the ground that in making a mistake in a return of the goods to the seller the buyer had negligently executed a voluntary bailment. If that case is to be considered an authority for reversal in this, what are we to do with the opening statement of that opinion beginning on page 461? It is as follows: "When the seller in filling an order sends more goods than the buyer has ordered, the buyer is under no legal obligation to accept any part of the goods. [Cases cited.] This seems to be the settled law, and was recognized as such by the trial court in this cause in its instruction to the jury." And this further statement in that opinion on the same page: "In the case now before us goods in excess of

those ordered were sent by the plaintiffs—sellers—
from Cleveland, Ohio, to the defendants, buyers, in St.
Louis, Missouri. There was evidence tending to show
that the defendants refused to accept the goods, and
immediately notified plaintiffs to that effect. That the
defendants might have stopped there, stored the goods
as bailees for plaintiff; and could have successfully
defended a suit for their value or contract price, seems
to be conceded. [Citing cases.]'' In that case, the
buyer had possession and control of the goods.

In our case, the only way defendant could get pos-
session or control of the onions was to pay the draft,
and thus be forced to execute, on his part, a contract
he never made.

It is true that plaintiff wrote a letter in Minneap-
olis, Minn., dated May 13, 1912, in which defendant
was advised that the car shipped would contain 494
crates, but the record does not show when this let-
ter was received by defendant. However, it is but
fair to assume that it took this letter the same length
of time to reach Springfield as was required for other
correspondence in the case mailed from the same place
to reach Springfield, which, under the evidence, was
some three days in transmission. Therefore, this let-
ter was received by the defendant either on the 16th
or 17th—not more than two days before his telegram
of rejection was sent. Besides, the letter did not dis-
close that there were 28,158 pounds of onions in the
car, or 4158 pounds more than the contract called for.
The order of the plaintiff was for 250 crates of crystal
wax onions, ''balance yellow,'' ''lightest minimum
car.'' There is evidence in the record that the crates
vary in weight, and this is known among commission
men. It is conceded that a ''minimum car'' is 24,000
pounds. And while the plaintiff's letter of May 13,
1912, did advise defendant that there were 494 crates
in the car, defendant should not be condemned for not
concluding therefrom, immediately on its receipt, that

the 244 crates of yellow onions would weigh enough to make a substantial excess over a "minimum car," and could not be held for a delayed rejection until he knew for certain from the invoice and bill of lading that the order had been stuffed. That plaintiff knew all the time from the thirteenth that this car contained an excess cannot be controverted. His agent, Massey, who first went to see defendant (on the 21st or 22d), says that he did not know what the excess was but merely was told by defendant that it was greater than the "minimum car," the quantity ordered, and had been rejected. Massey then conveyed only the general information by telegraph to the plaintiff without stating to him the amount of excess defendant claimed was in the car, *and immediately the plaintiff wired Massey to deduct seventy crates, the excess, and tender defendant the balance—which would leave the minimum carload.* The record does not bear out the statement that the car was not weighed. The defendant on cross-examination testified as follows: "Q. You obtained your knowledge there of the car weight from the invoice when it arrived? A. From the railroad company, too. They always weigh these cars when they come in. Q. They told you it was twenty-eight thousand pounds? A. Yes, sir. Q. Don't you know the Frisco railroad company didn't weigh that car here? A. I don't know that. Q. Now what agent told you that car was weighed here? A. The boys in the office there. These cars don't have to be weighed here. That weight is stamped on the waybill. When I got the invoice showing the number of crates that was in there I knew the weight was wrong. The Frisco told me there was twenty-eight thousand and something and when I got the invoice giving the number of crates, I knew the railroad weight was all right. I always inquired about the weight of a car because sometimes the weights are not right." Again, there was no question raised at the trial as disclosed by the record before

us that the plaintiff ever denied, or treated the case in any other way than, that there was an excess of seventy crates or 4158 pounds. The second witness placed on the stand by the plaintiff was asked the following question on direct examination, in getting at what would be the amount of the freight on the excess: "Q. Now I will get you to state, Mr. Robinett, what would be the freight on 4158 pounds of onions from Laredo, Texas, to Springfield, Missouri, in May, 1912, figuring on a minimum rate? A. On a car load rate on what? Q. Onions? A. What kind of onions?" —etc.

The rule is thus aptly stated in II Mechem on Sales, Sec. 1157: "Not only must the article delivered correspond in kind with that agreed upon, but it must also correspond in amount. Where a specific quantity or number is agreed upon, to be delivered at one time, that quantity or number must be delivered, and the seller will not perform his undertaking if he delivers either more or less." Again (Sec. 1158 Id.): "Where the seller delivers or *tenders* delivery of a greater quantity than was agreed upon, the buyer may refuse to receive it and reject the whole."

In 5 Elliott on Contracts, section 5049, the rule is stated in this language: "Where the seller delivers a quantity of goods larger than that contracted for, the buyer, in the absence of any controlling usage, special agreement or course of dealing between the parties, may accept the goods included in the contract and reject the rest, or he may reject the whole."

In the leading case of Barton v. Kane, 17 Wis. 38, 84 Am. Dec. 728, on page 734 the judge writing the opinion makes the distinction for requirement of the reason of objection where the quality is defective and where the quantity is in excess or less than that contracted for. It is put on the ground that where one knowingly sends more or less goods than ordered he is guilty of intentional violation of his contract

and his conduct savors of bad faith. It might be added as a reason requiring the ground of rejection as to quality that often in transit the goods may be damaged and that fact would of course be unknown to the seller.

The case of Norrington v. Wright, 115 U. S. 188, 29 L. Ed. 366, referred to in many textbooks, contains the following excerpts applicable here: ''The seller is bound to deliver the quantity stipulated, and had no right either to compel the buyer to accept a less quantity, or to require him to select part out of a great quantity; and when the goods are to be shipped in certain proportions monthly, the seller's failure to ship the required quantity in the first month gives the buyer the same right to rescind the whole contract that he would have had if it had been agreed that all the goods should have been delivered at once.'' '' 'The defendants refused to accept the first shipment, because, as they say, it was not a performance, but a breach of the contract. Where parties have made an agreement for themselves, the courts ought not to make another for them. Here they say that in the events that have happened one-fourth shall be shipped in each month, and we cannot say that they meant to accept any other quantity. At the outset, the plaintiffs failed to *tender* the quantity according to the contract; they *tendered* a much less quantity. The defendants had a right to say that this was no performance of the contract, and they were no more bound to accept the short quantity than if a single delivery had been contracted for.' '' (Italics are ours.)

But plaintiff relies on his offer to reduce the draft and deliver 24,000 pounds. This offer was made some six or seven days after the car reached Springfield and after defendant had rejected the shipment and ordered onions from another dealer. A sufficient answer to plaintiff's contention is to say that plaintiff had already done what he claimed was a compliance

with the contract on his part—he had made his tender—but by his offer to change admits there was in the first instance a noncompliance. However, this second offer came after a rejection and after the defendant, acting on such noncompliance and rejection, had placed himself in a different position and bought onions from another dealer. It seems to me that is sufficient to estop plaintiff from saying that his second offer met his obligations under the contract.

If the case is to go off on the "fair dealing theory," I do not believe it is fair dealing to permit a seller to try his hand at working off something he had not sold, in the face of a falling market, and, when he is detected, come into court and complain because the buyer did not follow him up and make him comply with his contract; *fair dealing*, in my judgment, would place that election with the buyer only. *Courtesy* and *politeness* might have demanded a more explicit rejection.

It is good law that where more is sent than is contracted for the buyer is to take the amount agreed upon provided he had not changed his position or been put to extra expense, delay or any extra burden. [2 Mechem on Sales, sec. 1158, p. 1012.] But in the instant case, to take any amount, defendant must pay a draft drawn covering the value of the 4158 pounds not contracted for together with the additional freight charge. And even on the second offer of the plaintiff the extra expense and the burden of extra freight was not reduced in the offer.

In the absence of anything that defendant did which caused the plaintiff to be misled or to change his position (and there is no such claim made in this case), it seems to me that the vital question we are to determine is, Does plaintiff make such a showing for himself that will entitle him to maintain this action? Did he substantially comply with his contract? If he did not, then his case must fail, even conceding

that the defendant failed in some duty that he owed. Our reports are full of cases holding that plaintiffs may maintain actions on contracts where they show a substantial compliance on their part, and there is an equal number holding they cannot recover where they fail to show a substantial compliance.

I do not think anyone will disagree with me in saying that in sending 4158 pounds of onion sets more than was contracted for was a substantial noncompliance, especially when in the course of the correspondence leading up to the contract the plaintiff knew that defendant at first wanted only a small quantity of onions, much less than a minimum carload, but that, on being advised that he would have to pay freight on a minimum carload anyway, he then placed his order to buy the "least minimum car." The shipment contained 4158 pounds in excess—more than one-sixth of the original order, or seventeen and one-half per cent in excess. The plaintiff's act brought the house down upon his own head. There is a maxim, based on a principle as effective in law as it operates in equity, whereby equity enjoins that he who comes into equity must come with clean hands; so, on the law side, this principle enjoins that he who contributes to his own injury cannot complain, or, that he who voluntarily places himself in wrong, will be left there by the law. Some learned judge has already expressed it in language which to me seems fitting, about like this: The law has no scales with which to determine whose wrongdoing weighed most in the compound that caused the mischief.

I concur in the opinion written by ROBERTSON, P. J., holding that plaintiff's admitted breach places him beyond the aid of the law and that the judgment of the trial court should be affirmed.

## ·DISSENTING OPINION.

STURGIS, J.—I am compelled to dissent from the majority opinion in this case and as my dissent would be meaningless without stating the grounds thereof, I shall do so briefly. I agree that the facts are not disputed but they are not fully stated. The plaintiff is really a commission merchant of Minneapolis, Minnesota, and bought the onions in question for defendant in Texas on a special order and had them there loaded in the car and shipped from Laredo, Texas, to Springfield, Missouri. The defendant knew this, as his preliminary inquiry was as to the price of Texas onions and his telegraph order was to *buy* for him the kinds designated. The car was loaded May 11, 1912, and on May 13th, the plaintiff so advised the defendant by letter and stated that the order contained 494 crates and that bill of lading and invoice would follow as soon as plaintiff received the proper papers from Texas. No reply was made to this, although the defendant says he knew the standard weight of a crate of onions to be fifty-seven pounds and that this amount was seventy crates in excess of a minimum car, 24,000 pounds, which he had ordered. The car arrived at Springfield on the fifteenth, and defendant at once inspected it without complaint. On the eighteenth, defendant received from plaintiff the invoice and notice from the local bank of the draft with bill of lading attached. This gave him no additional information as to the weight or size of the car, giving only the number of crates. There is no evidence that the car or onions were ever actually weighed, as the railroad took the crates at fifty-seven pounds each as a basis of freight charges and the draft was based on the price per crate; and the court's finding as to excess weight is based on the number of crates at fifty-seven pounds each. He then wired plaintiff four words: "Can't use car onions." This, to say the least, is am-

biguous and certainly does not imply that the car is
rejected on account of excess weight. Defendant ad-
mits that he could have sent a ten word telegram for
the same price giving his reason for rejecting the car.
Plaintiff explains the excess by the fact that the car
had been loaded in Texas by hauling the onions from
the country in wagons and that it was not easy to get
any exact amount. He says further that, never hav-
ing seen the onions, he thought the man he had bought
from in Texas had loaded some bad stock and on the
same day wired defendant: ''What's matter onions?
Loaded specially for you and if good condition expect
you accept. Advise quick.'' He wrote a letter to the
same effect. Receiving no reply from defendant, the
plaintiff caused a broker in Springfield to find out
the trouble and try to adjust the same and from him
got the first information on May 21st, that defendant
objected to the excess quantity of onions. The plain-
tiff at once instructed this broker to sell the excess
to some outside party and offer the defendant the
exact minimum car of 24,000 pounds and he would
reduce the draft. This offer and information were
given defendant on May 22nd, and he again refused
to accept, giving as his reasons: ''I can't use these
onions now. I needed the onions but I bought another
car Tuesday.'' Onions had suffered a sharp decline
and defendant admits that he did not accept the other
car. On this point the trial court found: ''I find
that between May 18 and May 21 the defendant ordered
another car but that said order was countermanded
and that said car was not received by the defendant
and that the defendant was occasioned no inconveni-
ence or embarrassment on account of ordering said
last-mentioned car.'' After notice to defendant, plain-
tiff sold the onions for the best price obtainable and
sues for the loss.

The only reason given by the trial court in its
finding of facts and conclusions of law for denying

plaintiff's recovery is that no specific offer to reduce the freight was made by plaintiff "unless it could be implied in the offer to reduce the draft and take off the defendant's hands the seventy crates in excess of the amount ordered." The trial court, however, found that no inquiry was made by defendant as to this or request for any such reduction. On the contrary, plaintiff claims that he fully intended and was willing to make such reduction. It is certain that defendant did not decline, and in his evidence he does not claim that he declined, to accept the minimum car because of excess freight charge. He based his refusal on it being too late—he had bought another car. There is not the slightest suspicion that defendant ever thought of refusing the car from fear of having to pay a slight excess of freight charge or that he would have accepted the car on a specific offer of this reduction.

The law should, and I think does, favor and promote fair dealing. No one can question but that defendant should, as between merchants dealing with each other in good faith, on the arrival of a car of onions shipped to him on his order from a point distant from the place of business of the seller, have informed the seller of the cause of its rejection by him. Had defendant done so, the matter could and doubtless would have been rectified. The seller has rights in such cases and the buyer cannot reject a shipment of goods tendered to him on his order and say nothing or act in bad faith in giving his reasons for the rejection. When a buyer has made a contract to purchase certain goods to be shipped to him from a distant point and such goods come to him in the usual course of shipment and are tendered as in compliance with the contract, it becomes the duty of the purchaser to, in good faith and in a reasonable time, inspect the goods and, if he finds a valid reason for rejecting the same as being deficient in quantity or

quality or other cause, he must exercise his right of rejection and notify the seller. I agree that he is not required to accept more goods than he ordered nor to even separate the amount ordered from a larger shipment, especially if this requires labor or expense, and the shipping a larger quantity than ordered gives a right of rejection. Such is the law also when all or part of the goods shipped are of inferior quality. A seller cannot force on a buyer more goods or a different kind or quality than ordered and it is useless to cite authorities to this effect. But the right of rejection when the goods are tendered may be exercised or waived. "Where the goods are not such as the buyer is bound to accept, he is, of course, justified in rejecting them. The law prescribes no particular method of rejection, and, in the absence of an agreement as to the method, any means which unequivocally indicates that the buyer refuses to accept the goods will suffice. The parties may agree that in case of rejection the buyer shall return the goods to the seller, but in the absence of such an agreement the buyer is under no obligation to return them; notice to the seller that they are rejected is all that the law requires." [2 Mechem on Sales, sec. 1402.] Where a certain quantity and quality of iron was purchased to be shipped from Liverpool, England, to New York by boat and part of it was landed at the dock and remained there several days to the buyer's knowledge without his either accepting or rejecting it, the claim was made as to this part that the purchaser waived by mere delay in rejecting it the right to reject for deficient quality. The court said: "It is the duty of a purchaser to act promptly in making an examination of goods sent upon his order, to see whether they comply therewith, and to give prompt notice to the vendor of their rejection, if found defective, if he intends to avail himself of that remedy. . . . Indeed, it stands upon the most obvious justice and equity, that

the seller should be apprised promptly if there is any objection and the vendee intends to reject the goods, so that he may retake possession or resell the goods and save himself as far as practicable, from loss." [Pierson et al. v. Crooks et al., 115 N. Y. 539, 551, quoted with approval in Steam Heating Co. v. Gas Fixture Co., 60 Mo. App. 148, 153.] The case just quoted from is long and it should be noted that it involves separate shipments of iron, one boatload of which was left at the dock several days after its arrival and was there inspected and rejected and then placed in a public warehouse, so that the buyers never had this part of the shipment in their possession. The question raised as to this part of the shipment was as to the duty of the buyers in inspecting and rejecting the iron while it was at the dock and tendered to the buyers. This is what the court is talking about in the above quotation. It is true that the purchasers in this case were suing to recover back the custom duties, etc., paid on this iron, but it takes no argument to show that the seller could set up as a defense when sued by the buyer to recover back the money paid the same facts as would have warranted his recovery in a suit for the purchase money, to-wit, using the language of the court, that "the plaintiffs (buyers) waived the right to reject the iron for defective quality by their delay in inspecting and rejecting it after it reached New York." The court distinctly says that the fact of the buyers making the payment under the facts of that case is "analogous to a payment in advance of delivery," and the case on this point is precisely as if the buyers had not paid and the sellers were suing for the purchase price. It is worthy of note also that the court found that the iron tendered was so defective in quality as to be unmerchantable. That notice must be given in case of rejection is plainly implied in Clothing Co. v. Singleton, 161 Mo. App. 366, 371; 143 S. W. 529, where it is said: "When a purchaser,

upon receipt of goods, knows the seller has shipped a less or greater quantity than he ordered, he has the option to rescind the contract, and to avail himself of such privilege it is not necessary to return the property or to make any other disposition of it, but an offer to return or a notice to the seller that he holds the property subject to his order, or that he will not accept it, will answer the demands of the law. [Landesman v. Gumersell, 16 Mo. App. 459.]'' [24 Ency. of Law (2 Ed.), 1090.]

Good faith requires a statement of the true reason for exercising the right of rejection, and a rejection on one ground is generally a waiver of any other grounds known to the purchaser. [35 Cyc. 213; 24 Ency. of Law (2 Ed.), 1092.] In Smith v. Pettee, 70 N. Y. 13, defendant refused to receive certain iron because shipped to him on a boat of a different name than that specified in the contract; later he claimed a deficiency in quality. The court said: ''The defendants did not, on the tender of the iron to them, make any objection to its quality, or that the quantity was deficient, but stood upon the ground that the name of the vessel differed from that written in their contract, and upon that contract only. Even in their answer to the complaint in this action, they do not set up any fault in the iron tendered to them; but upon the trial they gave evidence that out of the 103 tons or thereabouts which arrived by the St. Christopher, seven or eight tons were of a quality not embraced in the contract, and they seek to avail themselves now of that fact. Technical answers might be given to this claim, but the best one is that it is not founded in good faith. If the objection to receive the iron had been placed on the ground that among the 103 tons tendered there were eight which the defendants were not bound to accept, the plaintiffs could have separated these eight tons from the general mass, and would still have performed their contract by tendering the ninety-five

tons.'' In Sutton v. Risser (Iowa), 74 N. W. 23, the
plaintiff rejected the goods when tendered on account
of the quality and later tried to justify this on account
of the quantity. The court there said: ''The defend-
ants offered to correct 'any error or discrepancy,' but
the plaintiff refused to accept the offer, and would not
receive the goods. His refusal to accept any of the
goods cannot now be justified by the alleged failure of
the defendants to furnish a small quantity which he re-
fused to receive.'' To the same effect is Knox v.
Schoenthal, 13 N. Y. Supp. 7.

The above cases may not be ''on all fours'' in ev-
ery respect with the present case, nor do they need
to be to announce correct principles of law. It is only
claimed that they sustain the points on which they
are cited.

It must be borne in mind that there were two
tenders to defendant of the onions shipped in this case.
The first tender was of the car containing a larger
amount than ordered. He could have acted on that
only by paying the draft covering the excess. I agree
that defendant had a right to reject the shipment for
that reason, provided he had given prompt and proper
notice to plaintiff of the rejection. The second tender
of the onions was of the proper quantity, the excess to
be removed by plaintiff's agent and the draft reduced
accordingly. Whatever delay there was in making
this second tender was due to defendant's repeated
refusal to disclose the cause of his rejecting the car.
Plaintiff acted by wire and made the second tender the
very day he ascertained through the Springfield broker
the cause of the rejection. The defendant rejected
this second tender also, giving as his sole reason that
he had ordered another car, which, as we have seen,
the trial court found was countermanded and was no
reason at all. Now defendant justified this last rejec-
tion on the failure of plaintiff to specifically offer to
pay the excess freight—a reason not assigned by him

at all—and this is the only contention of his sustained by the finding of the trial court.

I may grant that the facts of a case might warrant or even compel a finding that the excess in quantity or deficiency in quality of the goods shipped might be so gross and outrageous that the shipper would be held to know that the buyer would not accept same and thus dispense with notice of the rejection and cause thereof. But, at most, that would be a question of fact in this case, as reasonable men might differ as to whether there might have been an honest mistake in conducting a large business, where much of the work is necessarily done by clerks and through other dealers at distant points, and plaintiff might have been in good faith in desiring to know why the car was not accepted. The trial court made no such finding against the plaintiff and we cannot uphold the judgment on a finding which we might think he ought to have made.

It seems to me that in both law and good morals the plaintiff is entitled to recover his loss.