# CHARLESTON.

McMULLAR COAL COMPANY *v.* CHAMPION COATED PAPER
COMPANY *et als.*

(No. 5845)

Submitted May 3, 1927.     Decided May 10, 1927.

CONTRACTS—*When Purchaser Contracted for 100,000 Tons of Coal
of Certain Quality, and Accepted and Used 46,164 Tons,
Not Justified in Rescinding Contract as to Coal Undelivered,
on Ground That Coal Accepted Did Not Conform to Con-
tract, Although He Had Frequently Complained to Seller.*

Where a purchaser contracted for 100,000 tons of coal of
a certain quality, and accepted and used 46,164 tons, he is
not justified in rescinding the contract as to the coal unde-
livered, on the ground that the coal accepted did not conform
to the contract, although he had frequently complained thereof
to the seller.

Appeal from Circuit Court, Logan County.

Suit by McMullar Coal Company against Champion Coated
Paper Company. Decree for defendant. Plaintiff Company
appeals.

*Reversed and remanded.*

*D. W. Brown, O. J. Deegan* and *Connor Hall,* for appellant.
*Chas. C. Benedict* and *Holt, Duncan & Holt,* for appellee.

HATCHER, PRESIDENT:

The pivotal question in this suit is, did the defendant
Champion Coated Paper Company have the right to rescind
a partially executed contract for purchase of coal.

On May 1, 1920, the E. R. Johnson Coal Mining Company
and the defendant entered into a contract wherein the John-
son company sold to the defendant the output of its mines
to the extent of one hundred thousand tons, at the price of
$4.00 a ton. Loading was to commence on the date of the
contract. The coal was to conform to a certain analysis.
The defendant advanced the Johnson company $75,000.00 on
the contract, with the understanding that $1.00 a ton was to

be deducted from the price of the coal furnished until the loan was repaid. A deed of trust was given by the Johnson company on certain real estate to secure the loan.

The defendant accepted forty-six thousand, one hundred and sixty-four tons of coal on the contract between May 1, 1920 and October, 1921. On October 3, the defendant cancelled the contract, upon the ground that the quality of the coal had been uniformly below the standard agreed upon.

The plaintiff is the successor in title of the Johnson company. The bill denies the right of the defendant to rescind the contract, demands an accounting, and prays that the deed of trust given by the Johnson company be cancelled as a cloud upon plaintiff's title.

The answer alleges that the quality of the coal furnished by the Johnson company and its assigns was inferior to that prescribed by the contract, that there was a balance of $30,190.12, principal and interest, due on the loan to the Johnson company, and by way of affirmative relief prays for an accounting, and for the execution of the deed of trust.

The lower court found for the defendant.

For the plaintiff, the record shows letters from the defendant urging the shipment of more coal; others requesting a suspension of shipments because of unfavorable conditions at defendant's plant or in its business; but none, between the date and the rescision of the contract, threatening cancellation of the contract because of inferior coal. From May 1, 1920, to Jan. 1, 1921, the market price of coal averaged $8.71 a ton. In Dec., 1920, the market price dropped below the contract price for the first time since the date of the contract. On Dec. 20, 1920, the defendant wrote the coal company complaining of a dull period in its business, of several weeks duration, stating that it was facing a heavy loss, and asking for a "considerable price reduction." In Jan., 1921, the coal company was informed by representatives of the defendant that unless the price of coal was reduced, the defendant would shut down. Because of that threat, the price of the coal was gratuitously reduced by the coal company to $2.75 a ton, which price continued until June 1, 1921, when a fur-

ther reduction was made to $2.25 a ton. The latter price was continued until the contract was rescinded, at which time the market price of coal had dropped to $1.50 a ton. 53,836 tons of the contract tonnage was undelivered. This balance was mined and could have been shipped to the defendant in the sixteen months following Oct. 1, 1921. During that period the market price of coal averaged much less than the reduced price in effect when the contract was cancelled.

The plaintiff presented several analyses, purported to have been made by a chemist to whom coal from its mines had been sent. Those analyses indicated a coal fully up to the standard prescribed by the contract. But the chemist did not testify. We cannot assume that the analyses returned by the chemist (a) were made of plaintiff's coal, and (b) that they are correct. The analyses are therefore of no probative value.

In support of its right to rescind the contract, the defendant gave evidence of numerous complaints made by it to the coal company regarding the quality of the coal, consisting mainly of letters dated Aug. 12, Aug. 16, Aug. 26, Dec. 6, 1920, and Mar. 9, Mar. 21, June 23 and July 12, 1921. It also presented analyses claimed to have been made of every car of coal received on the contract—407 in all. From these analyses it would seem that not a single car measured up to the standard. The defendant attempted to prove the analyses by its chemist. He admitted having an assistant and would not commit himself as to how many of the 407 analyses he personally had made. The witness also admitted that he had not personally secured any of the coal analyzed. He stated that the samples for analysis were taken ''by our sample men who are under the immediate charge of our combustion engineer''. Neither the assistant chemist, the sample men, nor the combustion engineer testified. The defendant's analyses are therefore entitled to no more consideration than those of the plaintiff. No objection seems to have been made to that evidence by either party, so for the sake of argument we will review it. From the evidence it appears that during the seventeen months from May 1, 1920, to Oct. 3, 1921, with

full knowledge of the inferior quality of the coal it was receiving on its contract, the defendant made 407 separate waivers in accepting that coal. Despite the alleged inferiority of the coal, the defendant was very eager to secure it during the period that the market price of coal was higher than the contract price. Can it be a mere coincidence that the desire of the defendant for this coal commenced to wane in the identical month that the market price of coal dropped below $4.00 a ton; that its dislike therefor increased inversely as the market price continued to fall and became intolerable when it could purchase coal on the market at $1.50 a ton? If the coal from plaintiff's mine was of sufficient quality to warrant acceptance under the contract when the market price of coal was high, why did it become unsuitable at the same time the market price became so low? The rescision of the contract and the market price of $1.50 a ton bear such a close relation that the reason for the cancellation advanced by the defendant is patently specious.

In *Ellison* v. *Gro. Co.,* 69 W. Va. 380, a situation was presented where, after a large part of a contract for hay had been executed, the purchaser rescinded on the ground that some of the hay which he had accepted was defective. It was there held that the purchaser could not cancel the contract because of the inferior hay, but must "look to damages". I find only two cases not reviewed in that decision which appear to be contrary thereto: *King Philip Mills* v. *Slater,* 12 R. I. 82, and *Morrison* v. *Leiser,* 73 Mo. App. 95. Both of those cases involved first deliveries. They may be differentiated for that reason as *Norrington* v. *Wright,* 115 U. S. 188, was differentiated in the *Ellison* opinion, (384). It is now settled law that when a buyer has knowingly accepted defective installments on a contract, he cannot rescind the contract because of the inferior quality of those installments. In addition to the authorities reviewed in the *Ellison* case, see 24 R. C. L., Sales, Sec. 564; 35 Cyc., Sales, p. 222, (VIII); Mechem on Sales, Sec. 1399; Page, Contracts, Sec. 3019; Annotation 29 A. L. R. 1517 and the many cases there cited.

The defendant contends that its acceptance of the alleged

inferior coal was no waiver of the coal company's breach, because the defendant complained from time to time of the quality of the coal. The authorities cited in support of that argument do not apply here. The acceptance of the alleged inferior coal was on such a large scale and continued over such a long period, "as to show a disinclination to insist upon strict performance of the contract." 3 Elliot, Contracts, p. 240, Sec. 2051. "Where defendant contracted for the purchase of a large quantity of yarn from plaintiffs, to be manufactured and delivered in weekly installments, and accepted and used a number of shipments, although making complaint about the quality, which it claimed was not that required by the contract, it could not thereafter rescind the contract as to yarn undelivered because of such alleged breach." *Harding, Whitman & Co.* v. *York Knitting Mills,* 142 Fed. 228.

The defense of rescision because of poor quality of accepted coal is without merit. The decree of the lower court will therefore be reversed and the case remanded.

*Reversed and remanded.*