**FAIRCHILD STRATOS CORPORATION,**
Appellee,

v.

**LEAR SIEGLER, INC.,** Appellant.

No. 9415.

United States Court of Appeals
Fourth Circuit.

Argued June 17, 1964.

Decided Sept. 23, 1964.

William R. Sweeney, Los Angeles, Cal., and J. Cookman Boyd, Jr., Baltimore, Md., (Sauerwein, Benson & Boyd, Baltimore, Md., and Sweeney, Irwin, Cozy & Foye, Los Angeles, Cal., on the brief) for appellant.

James W. Lamberton, New York City (Cleary, Gottlieb, Steen & Hamilton, Venable, Baetjer & Howard, Baltimore, Md., and William L. Lynch, New York City, on the brief), for appellee.

Before HAYNSWORTH and J. SPENCER BELL, Circuit Judges, and MICHIE, District Judge.

J. SPENCER BELL, Circuit Judge.

Appellant, the Hufford Corporation Division of Lear Siegler, Inc. [hereafter Hufford], appeals from a declaratory judgment of the United States District Court for the District of Maryland[1] awarding appellee, Fairchild Stratos Corporation [hereafter Fairchild], damages upon a finding that Hufford breached a special warranties contract existing between the parties.[2] We affirm the district court's finding of a breach and its award of compensatory damages, but not for the amount determined by the court.

The background facts of this case are rather complex; the legal issues are reasonably simple. Generated by Fairchild's invitation to bid, Hufford on January 4, 1960, submitted proposals to design, fabricate, and install a stretch

---

1. The district court's opinion is unreported.

2. Fairchild Stratos Corporation, a Maryland corporation, with its principal office and place of business in Hagerstown, Maryland, brought the action in the federal court against Lear Siegler, Inc., a Delaware corporation, having its principal office in California, on the basis of diversity of citizenship.

wrap forming press in Fairchild's Hagerstown, Maryland, plant. The press, according to the district court, was to be "a sophisticated piece of machinery, the purpose of which was, with a high degree of automation, to pull and stretch a sheet of aluminum to conform to dies for half sections of boat hulls so as to cause the formation of aluminum half-boat hulls which could be thereafter welded together to make a complete hull for certain aluminum pleasure boats that [Fairchild] desired to manufacture and sell." In its proposals, Hufford made certain affirmations of fact which are germane to the present controversy.

Hufford stated that "the equipment will be designed and built so that *no hand work* will be required in the formation of parts." (Emphasis in original.) Hufford further stated that "the stretch forming equipment will be capable of producing formed boat hull halves at a rate of ten (10) parts per hour or six (6) minutes per part on existing dies constructed by Fairchild * * *." This statement was qualified in two respects: first, by the statement that it could not be expected that the press would, immediately after installation, be capable of producing parts at the guaranteed rate until operators had been trained and the machine's functions refined, and second, as a consequence, Hufford was "to provide a qualified operating crew for a period of three (3) months to bring this facility to a full scale production capacity, simultaneously training [Fairchild's] personnel in operational procedures, maintenance, tooling, etc." The cost of providing the crew was to be borne by Fairchild.

Hufford agreed to manufacture and ship components in the order required for installation, so that installation could proceed concurrently with the latter stages of machine manufacture. Shipments were to start approximately four months from the date of receipt of the proposals and were to be completed two months thereafter. The purchase price was to be paid in six installments, five during the time that Hufford was shipping parts to Fairchild and installing them at Fairchild's plant and the sixth upon the completion of shipment, installation, and acceptance of the parts by Fairchild.

Fairchild issued a purchase order on January 21, 1960, accepting Hufford's proposals. Fairchild, in the purchase order, suggested that the cost of the operating crew be prorated, so that if less than three months was required, Fairchild's obligation would be accordingly reduced. Fairchild also suggested that shipments begin within four months from January 15, 1960, (the date of Fairchild's acceptance of the proposals by telephone) and be completed two months thereafter. Hufford agreed to these suggestions on February 2, 1960, and as of that date the terms and conditions of the contract were made explicit.

By the terms of the contract, Hufford was obligated to begin shipment of the components of the press on May 15, 1960, and to complete deliveries by July 15, 1960. This schedule was not met. Hufford's first shipment, that of rails for the press, was not made until July 12, 1960; the final shipment was not made until September 8, 1960; and not until November 21, 1960, did the press become operable. Thus, Hufford from the beginning was late in deliveries and acknowledged this fact in inter-company correspondence. For instance, a July 1, 1960, memorandum from Hufford's president stated:

"We are badly behind schedule on this machine. Our customer is in serious need for production from the machine to introduce their new line of boats in time to meet the marketing season."

The operating crew which was to be provided for a three month period arrived at Fairchild's plant and began work on the press on October 31, 1960. Initial attempts to stretch matching half hulls failed. Some measure of success was achieved on December 22, 1960, when a matching pair of half hulls was stretched; but it was found that when

the half hulls were trimmed and put on the assembly jig, the tumble home area [3] lacked any formation at all. It was this area that was to present the major difficulties in the press' operation right up until Hufford's breach. After the December experience, Hufford undertook to redesign the machine assembly used in forming the tumble home area.[4] Discussions were held within the period between January 6, 1961, and February 10, 1961, between representatives of the two companies to discuss problems in connection with the press and to try to work out an agreement as to what would constitute an acceptable half hull. Fairchild requested a completion date for the press' qualification, and Hufford's representative stated that Hufford expected the press to be ready for acceptance by April 7, 1961. Fairchild, waiving any claim it may have had to hold Hufford in breach at a prior date, orally advised Hufford that June 1, 1961, was the deadline for qualification.

Hufford, purporting to confirm the oral agreements between the parties, submitted a written memorandum in which it agreed to redesign and modify the machine element to provide configuration in the tumble home area and proposed a set of standards to determine whether the half hulls were in conformity with the die and with each other. Fairchild replied in writing, suggesting specific tolerances of stand off from the die in both the tumble home and forward areas of the boat and gave formal notice of the June 1, 1961, deadline. Hufford wrote and declined to accept specific tolerances as dimensional limitations, but it reiterated its memorandum position that the stand off in the tumble home area would be no more than that which could be pushed into position against the die by hand pressure. Hufford again acknowledged, without guaranteeing, its target date of April 7, 1961. On April 5, 1961, Hufford stretched two half hulls on

the press. Although there was marked improvement in conformation on the second half hull, the stern area stood approximately two feet from the die, and it was impossible to force it into position by hand. Under these circumstances, Fairchild refused to give written confirmation that the machine was functioning properly.

Additional corrective work was done on the press by Hufford representatives and on April 15, 1961, they began stretching half hulls with Fairchild personnel as onlookers or helpers in loading and unloading the press. On April 24, 1961, Hufford representatives stretched three half hulls, and the third, as the most satisfactory, was left on the die for Fairchild's inspection. The following day, April 25, 1961, Hufford's representative advised Fairchild that he was ready for the qualification test. That same day, upon Fairchild's inquiry, Hufford's representative prepared a test procedure and delivered it to Fairchild. It was agreed by the parties that the qualification run would consist of six half hulls of each hand rather than the ten upon which they had previously agreed.

The qualification run was never undertaken. Instead, Fairchild and Hufford reached an impasse. Hufford insisted that Fairchild accept the standards for forming sequence and procedures as set forth in Hufford's memorandum of April 25, 1961, and further insisted that if these standards were met by the qualification test, Fairchild must accept the press without regard to whether or not it could produce acceptable boat hulls. Fairchild adamantly refused, advising Hufford that it might undertake the qualifying test at any time but that Fairchild would accept or reject the press only on the basis of its operating characteristics and that there was no substitute for actual demonstration. This impasse came to a head on May 26, 1961,

---

3. Described by the district court as the area in the stern of the boat "where the sides bend inward to join. It may be likened to the base of an isosceles triangle."

4. Formation of the tumble home area was to be achieved by imposing localized pressure on the aluminum sheets by the use of heavy pressure rubber rollers.

when Fairchild sent a telegram to Hufford stating that:

"Fairchild awaits proof of press by actual operation by Hufford. June 1st nearly here. If Hufford fails to heed our warning regarding this firm deadline litigation will undoubtedly follow shortly."

Although duly warned, Hufford failed to meet the June 1, 1961, deadline, and on May 31, 1961, stated its willingness to "start acceptance test on June 5." Fairchild on June 2, 1961, notified Hufford not to send test personnel and on June 23, 1961, formally rescinded the contract. Thereafter, Fairchild brought this declaratory judgment action.

## I.

### BREACH OF CONTRACT

In its memorandum opinion the district court exhaustively delineated the pre-contract negotiations between the parties, the causes for delay in shipment of the component parts, and the problems attending the installation and functioning of the press. We need not cover the same ground. Suffice it to say that the district court had ample support in the record to conclude that whatever delay in the final performance of the contract could be attributable to Fairchild, it "was considerably less than the extension of the date for performance granted by Fairchild" and that failure to meet the June 1, 1961, deadline was the fault of Hufford alone. Applying the law of Maryland, conceded by the parties to govern, the district court found the ultimate facts and conclusions of law to be as follows:

"1. Hufford agreed to build and install a stretch press *and to complete shipment thereof* by July 15, 1960, and especially warranted the press to be capable of producing within three months from that date ' * * * boat hull halves at a rate of ten (10) parts per hour or six (6) minutes per part on existing dies constructed by Fairchild,' and that the stretch press would be ' * * * designed and built so that *no hand work* will

be required in the formation of the parts.'

"2. Hufford failed to perform the contract or to fulfill its special warranty by June 1, 1961, notwithstanding that Fairchild waived performance by Hufford prior to that date, and had agreed to a less rigorous test to determine the acceptability of the stretch press.

"3. Fairchild's refusal to extend Hufford's date of performance beyond June 1, 1961, was fair and reasonable under all of the circumstances.

"4. Whether the boat press is capable of performance in accordance with the special warranty is unknown, but, in view of the repeated failure of the stretch press to perform, the conclusion is inescapable that it is extremely unlikely that the boat press possesses this capability, absent an actual demonstration that it possesses this capability.

"5. Hufford had an obligation to demonstrate the production capability of the stretch press on or before June 1, 1961, and its refusal to meet that obligation was arbitrary, unreasonable and without legal justification, so that Hufford's refusal constituted a material legal breach of the contract.

"6. Fairchild had a legal right to refuse to accept the stretch press and to rescind the contract. Fairchild *refused further performance of* the contract on *and after* June 2, 1961, *and formally rescinded it by notice dated June 23, 1961,* because of Hufford's breach of warranty and Hufford's unjustified refusal to perform.

"7. Fairchild is entitled to judgment on Hufford's counterclaim and to damages and supplementary declaratory relief, as hereafter discussed." (Italics represent modifications in initial findings by the district court.)

On appeal, Hufford makes three basic contentions with respect to the above

789

ultimate findings: (1) that Hufford had no contractual obligation to demonstrate the press' capabilities by June 1, 1961; (2) that Hufford's failure to demonstrate by June 1, 1961, was not such a material breach of the contract as to warrant Fairchild's rescission; and (3) that Fairchild's failure to perform its own contractual obligation prevented rescission. We discuss these contentions *seriatim*.

**(1).** *Hufford's Contractual Obligations*

■ Hufford strenuously contends that it had no contractual obligation to demonstrate the press' warranted capabilities by performing an acceptance test. While it is true that the contract did not provide by express language that Hufford must conduct such a test,[5] the contract did provide that Hufford guaranteed a press that would produce ten parts an hour of such conformation to existing dies that no hand work would be required in their formation. These warranties, clearly spelled out in the contract, of necessity required Hufford to demonstrate their fulfillment. These warranties constituted the contractual standard that Hufford was required to meet by an acceptance test. Fairchild properly rebuffed Hufford's attempts to superimpose additional parts standards that were neither expressly provided for nor implicit in the terms of the contract.[6] Fairchild was concerned with a satisfactory finished product; the method by which Hufford was to establish the press' capabilities was not Fairchild's concern. Fairchild had a right to expect a press of

a guaranteed production rate producing parts of such quality as to require no hand work in their formation. Under the contract Fairchild could not insist upon more, but conversely, it had a right to demand no less.[7]

**(2).** *The Materiality of Hufford's Breach*

The district court, after finding that Hufford's failure to demonstrate the press' warranted capabilities by June 1, 1961, constituted a breach of the contract, further found that the breach was material and justified Fairchild's rescission. Hufford contends, however, that even if it be assumed that Hufford's failure to demonstrate the press' warranted capabilities amounted to a breach of the contract, such breach may not be deemed so material as to defeat the parties' just expectations. Hufford points to its willingness to tender performance on June 5, 1961, and argues that its purported breach resulted in only two lost working days—by no reasonable standard a material breach.

■ Hufford's argument carries some force. Generally "in the contracts of merchants, time is of the essence," Norrington v. Wright, 115 U.S. 188, 203, 6 S.Ct. 12, 29 L.Ed. 366 (1885), and the failure of the seller to meet a promised day of performance permits the buyer to rescind. We think, however, that the present contract may not be viewed as an ordinary mercantile contract. It is more akin to the contract discussed in Beck & Pauli Lithographing Co. v. Colorado Milling & Elevator Co., 52 F. 700 (8 Cir. 1892). There, in considering a

5. Hufford points out that one of Fairchild's key witnesses admitted that "the press was within its limits as far as time was concerned." But as Fairchild correctly notes, this was not "an admission that it would do so and at the same time produce formed half boat hulls of reasonable conformity to the dies and to each other." Time *and* quality were never correlated.

6. Hufford failed in its effort to prove that even absent contractual provisions, industry custom required a buyer to agree to a test procedure and detailed parts standard prior to actual acceptance test-

ing. Hufford's three expert witnesses declined to make this assertion, and, indeed, the second testified that such provisions are inserted primarily for the buyer's protection.

7. Since we conclude that Hufford failed to demonstrate the press' warranted capabilities as it was implicitly required to do under the contract, we do not consider Hufford's additional argument that the district court erred in holding Hufford in breach without the requisite finding of fact that the press was demonstrably unable to perform as warranted.

seller's action for the purchase price of custom-made stationery, the Eighth Circuit reversed a directed verdict for the buyer. The court declined to accept the buyer's contention that the seller's delay of one day in delivery constituted a material breach of the contract, for as the court stated:

"[I]n contracts for work or skill, and the materials upon which it is to be bestowed, a statement fixing the time of performance of the contract is not ordinarily of its essence, and a failure to perform within the time stipulated, followed by substantial performance after a short delay, will not justify the aggrieved party in repudiating the entire contract, but will simply give him his action for damages for the breach of the stipulation. Tayloe v. Sandiford, 7 Wheat. 13, 17 [5 L.Ed. 384]; Hambly v. [Delaware, M. & V.] Railroad Co., 21 Fed.Rep. 541, 544, 554, 557." 52 F. at 703.

 We think that this was, as in the Beck case, a contract for "work or skill" and "time [was] not * * * of its essence." [8] Thus, Hufford's delay of two working days in demonstrating that the press performed in accordance with its warranted capabilities, nothing else appearing, would not have justified Fairchild's rescission. But ours is a different case. It will be recalled that the contract contemplated that shipment of component parts of the press was to begin May 15, 1960, and was to be completed by July 15, 1960, at which time Hufford was given three months to bring the press up to its warranted capabilities. By October 15, 1960, Hufford was to have completed its contractual obligations and was to receive the final installment payment, and Fairchild was to begin mass production and distribution of aluminum pleasure boats. This schedule was not met, and in view of the sophistication of the press, the first of its kind, it seems improbable that the parties expected the schedule to be met to the day. Significantly, Fairchild waived a demonstration of the press' warranted capabilities until June 1, 1961. This date seemed an eminently reasonable deadline in view of Hufford's assurance, repeated in correspondence, that it would have the press ready by April 7, 1961. Thus, we are not faced here with the situation where a seller in a contract for "work or skill" fails to meet a specified day for performance. Rather we are faced with a seller who failed to meet a contract performance date, failed to meet a subsequent date set by himself, and then failed to meet an even later date set by the buyer. Even in out-of-the-ordinary mercantile contracts, there must come a day when a long suffering buyer may demand performance or opt rescission. In our case that day came on June 1, 1961.

We find support in several cases. In Kahle v. Amtorg Trading Corp., 93 F. Supp. 405 (D.N.J. 1950), the seller, an engineering firm, brought an action for the purchase price of a machine manufactured to the buyer's specifications after the buyer had refused delivery tendered four months late. The court upheld the buyer's right to refuse delivery and denied the seller's requested relief. The law of Maryland, controlling here, is to the same effect. In Velte v. McBride, 208 Md. 434, 118 A.2d 640 (1955), the

8. Professor Williston has observed that:
"When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party. It does not mean that delay will give rise to a right of action against him. A breach of any promise in a contract, whether of vital importance or not, will do that; nor does the phrase mean merely that time is a material matter, but that it is so material that exact compliance with the terms of the contract in this respect is essential to the right to require counter-performance." 6 Williston, Contracts § 846 (Jaeger ed. 1962). Looking at this principle from the buyer's point of view, if time is of the essence, he may refuse payment for the seller's late performance.

buyer placed an order with the seller for custom-made metal mast parts. The shipments of these parts were to be staggered, to begin on June 15, 1951, and to be completed by October 15, 1951. The seller failed to meet the first and subsequent delivery dates, and the buyer warned that he would cancel the contract unless the *first* shipment was made by October 15, the day originally scheduled for the *last* shipment. This deadline was not met, and the trial court upheld the buyer's action of rescission. On appeal, the Court of Appeals affirmed. See also Standard Scale & Supply Co. v. Baltimore Enamel & Novelty Co., 136 Md. 278, 110 A. 486, 9 A.L.R. 1502 (1920).

### (3). *Fairchild's Failure to Perform*

■ Hufford makes the argument that Fairchild, having defaulted in its contractual duty to reimburse Hufford for the cost of furnishing an operating crew for the three month period beginning October 31, 1960, has not fully performed under the contract and may not now rescind. Under the original contract, Fairchild was to pay an amount not exceeding $23,000 for a qualified operating crew, to be provided at Fairchild's plant by Hufford for a three month period to bring the press up to its warranted capabilities, simultaneously training Fairchild personnel in the press' operation. By mutual agreement Hufford agreed to prorate this amount so that Fairchild's obligation would be accordingly reduced if less than three months was required. The parties contemplated that installation would be completed and the machine made functional prior to beginning the three month refinement period. Hufford was to sub-

mit to Fairchild on the first of each calendar month an invoice representing Hufford's total charge for the services of the operating crew for the immediately preceding month, and Fairchild was to pay this invoice within ten days of its receipt. Hufford sent in the operating crew on October 31, 1960, although the press was not in condition to operate continuously until November 21, 1960. Fairchild quite properly refused payment for the first month unless the charge was reduced for periods of the crew's inactivity. Fairchild's position was made clear to Hufford by Fairchild's reply to the invoice for the first month.[9] Additional correspondence failed to resolve this difference, and to date no portion of the $23,000 has been paid by Fairchild.

We think that under Maryland law Fairchild had the right to refuse payment until the correct charge for the services of the operating crew could be determined. As stated in Fromm Sales Co. v. Troy Sunshade Co., 222 Md. 229, 159 A.2d 860, 863 (1960):

"The failure to make payments under [an installment agreement] indubitably constitutes a material breach *in the absence of a showing of justification or excuse*." (Emphasis added.)

In the circumstances here existing, we do not believe that Fairchild's refusal to pay a disputed sum, disputed in good faith, could be considered a material breach, excusing further performance under the contract by Hufford. See 6 Williston, Contracts § 866 (Jaeger ed. 1962). Cf. Shapiro Eng'r Corp. v. Fran-

9. "5. Concerning item two. We agree familiarization of Hufford personnel with operating details falls within the scope and intent of item two of the purchase order; however, we cannot agree that implementation of item two continues on an uninterrupted basis since 10–31–60. Down time due to problems of design, repetition of electrical failures, and other items affecting operation is considered excessive. Item two of the purchase order contemplated machine being completely functional before starting this phase of refinement and education. Item two further states that work will be prorated according to the weeks of work actually required and used by the Hufford operating crew. Since excessive down time has virtually stagnated work under this item of the purchase order, we can only agree to 10–31 as being the effective date provided proper allowance is made for periods of inactivity. Your comments and continued cooperation will be appreciated."

cis O. Day Co., 215 Md. 373, 137 A.2d 695 (1958).

We conclude that the district court correctly held that Hufford's failure to demonstrate the warranted capabilities of the press by June 1, 1961, constituted a material breach of the contract and entitled Fairchild to rescind.

## II.
## DAMAGES

The district court, having found Hufford in breach of the contract, assessed damages under the Maryland Sales Act,[10] holding that it was immaterial whether Fairchild's cause of action arose under § 87(1) (c) or § 87(1) (d). These and related sections provide:

"§ 87. *Rights in case of breach of warranty.*

"(1) Where there is a breach of warranty by the seller, the buyer may, at his election—

\* \* \* \* \* \*

"(c) Refuse to accept the goods, if the property therein has not passed, and maintain an action against the seller for damages for the breach of warranty;

"(d) Rescind the contract to sell or the sale and refuse to receive the goods; or, if the goods have already been received, return them or offer to return them to the seller and recover the price, or any part thereof, which has been paid.

"(2) When the buyer has claimed and been granted a remedy in any one of these ways, no other remedy can thereafter be granted.

\* \* \* \* \* \*

"(6) The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty.

\* \* \* \* \* \*

"§ 88. *Interest and special damages*

"Nothing in this subtitle shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, or to recover money paid where the consideration for the payment of it has failed."

■ In support of the argument that § 87(1) (c) applied, the district court noted that the purchase was not to be complete until Fairchild accepted the press and that since the act of acceptance never transpired, the "property" never passed from Hufford to Fairchild. Thus, Fairchild was entitled to recover all damages "naturally resulting, in the ordinary course of events, from the breach of the warranty," as prescribed by § 87(6). But even if the action was for rescission under § 87(1) (d), as we have assumed throughout this opinion, the recoverable damages would be the same. In Russo v. Hochschild, Kohn & Co., 184 Md. 462, 41 A.2d 600, 157 A.L.R. 1070 (1945), the Maryland Court of Appeals held that special damages, in addition to the purchase price, may be recovered in an action for rescission by virtue of the provisions of § 88.

■ Applying the doctrine of Hadley v. Baxendale. 9 Exch. 341 (1854), as approved by the Maryland Court of Appeals in Winslow Elevator & Machine Co. v. Hoffman, 107 Md. 621, 635, 69 A. 394, 17 L.R.A.,N.S., 1130 (1908), the district court held that whether the action was brought under § 87(1) (c) or § 87(1) (d), Fairchild was entitled to those "damages which [were] the natural and direct result of the breach of the contract, where such damages may reasonably have been within the contemplation of the parties at the time the contract was made."

The amounts were found to be as follows:

### Category I
$218,872.26

progress payments paid by Fairchild under the contract.

---

10. Ann.Code of Md. art. 83 (1957).

39,888.08
 cost to Fairchild of construction of the stretch press foundation, including appurtenant electrical and mechanical facilities.

3,434.30
 cost of aluminum sheets furnished by Fairchild to Hufford in the latter's attempt to qualify the machine.

1,944.46
 cost to Fairchild of miscellaneous items purchased by Fairchild at Hufford's request to make the press operable.

14,802.60
 cost to Fairchild of compensation of its hourly and salaried employees who assisted Hufford in the installation and testing of the machine.

2,975.00
 cost of restoration of Fairchild's plant to the same condition as prior to delivery of the machine.

5,643.57
 Maryland use tax paid by Fairchild on the purchase of the machine.

8,541.83
 Fairchild's cost of equipment, less depreciation and salvage, intended to be used with the boat press.

10,824.80
 transportation costs of component parts of the storage press paid by Fairchild, as per the contract.

Category II

2,513.82
 travel and related expenses incurred by Fairchild in connection with the exhibition of prototype boats.

48,000.00
 payments to Miracle Marine, Inc., a distributor, as expenses under a distributor's contract.

14,000.00
 claim asserted by Miracle Marine, Inc., as damages under a distributor's contract.

8,915.96
 settlement amount paid by Fairchild to Kioti Marine, Inc., a distributor, for termination of distributor's contract.

6,594.60
 settlement amount paid by Fairchild to Frank A. Baldus & Associates, a distributor, for termination of distributor's contract.

$384,951.28 Total

Interest was ordered on $352,465.72 from June 2, 1961, to the date of judgment, and a decree was entered directing Hufford to effect the removal of the press, on condition that when the judgment was paid, Fairchild was to assign its claim for a refund of Maryland use taxes to Hufford.

Hufford contends that the district court erred in its award of damages in two respects: (1) that the court improperly admitted hearsay evidence to establish the amount of damages and (2) that the damages comprising category II bore no proximate relationship to Hufford's breach.

■■■ Hufford's first contention lacks merit. Fairchild proved certain items of damage by submitting summary sheets tabulating and summarizing voluminous records drawn from Fairchild's accounting files. Two items were clearly marked as estimates; the remainder listed the records from Fairchild's files upon which they were based, including purchase orders, vouchers, and checks. We think that the citations referred to in the district court's opinion fully support its conclusion that since the original records were admissible as business records under 28 U.S.C.A. § 1732,[11]

11. Maryland law is to the same effect. See Ann.Code of Md. art. 35, § 59 (1959); O'Donnell v. State, 188 Md. 693, 53 A.2d 688, 54 A.2d 315 (1947); La-

summaries and tabulations were likewise admissible. United States v. Mortimer, 118 F.2d 266 (2 Cir. 1941); Lemon v. United States, 164, 953 (8 Cir. 1908); 5 Wigmore, Evidence § 1530 (1962 Supp). We conclude that the manner in which Fairchild sought to prove its damages was permissible and that the district court's finding as to the amount of damages comprising category I, $304,926.90, was not clearly erroneous.[12]

Hufford's second point, however, is well taken, and we must agree that the damages comprising category II were not "directly and naturally resulting, in the ordinary course of events, from the breach of the warranty," as required by § 87(6) of the Maryland Sales Act, art. 83. They must accordingly be reversed as a matter of law.

Some review of germane background facts is essential to an understanding of the reasons for our decision. In January 1960 Fairchild entered negotiations to become sole supplier for aluminum pleasure boats for Sears, Roebuck & Company [hereafter Sears]. Under this arrangement, Fairchild was to receive fabricated half boat hulls of Sears design and was to assemble these half boat hulls by welding them down the center and installing seats and hardware. The negotiations bore fruit, and the Sears boat program was commenced in February 1960, with Fairchild agreeing to supply boats for the 1960 season. Fairchild also wished to develop the means to fabricate half boat hulls of its own design to be assembled and distributed to Sears and Fairchild's own distributors for the 1961 season. It was this latter plan that led to the contract with Hufford to design and manufacture the press. Fairchild then entered into eight exclusive distributorship contracts within designated areas for the purpose of selling the

aluminum pleasure boats to be fabricated and assembled by Fairchild. The key middle man in Fairchild's scheme was Miracle Marine, Inc. [hereafter Miracle Marine], one of the distributors, who obtained the other seven distributorships and handled all promotional work.

The first setback to the boat program came on June 17, when Fairchild received a request from Sears to stop work on Sears designed boats being assembled by Fairchild. This request was prompted by structural failure reported by the Sears Testing Center. Fairchild continued assembling boats on the assumption that structural improvements made to an inventory boat would solve the problem. Subsequent testing indicated that all the problems had not been resolved, and a Fairchild management decision was made on July 19, 1960, to stop work on the Sears program and to engage the services of a qualified marine architect to evaluate the design of both the Sears and Fairchild models. The completion of this evaluation was set for September 1960.

Meanwhile, an interoffice memorandum by Fairchild's corporate secretary of July 18, 1960, revealed that Fairchild was considering abandoning the boat program altogether. One week later Fairchild sent the following letter, quoted in pertinent portions, to Miracle Marine:

"Gentlemen:

During your visit to the Fairchild factory on July 25th you were informed that Fairchild was currently reevaluating its boat and related marine products program for the purpose of determining its future course of action with respect to this activity. Pending completion of this reevaluation, which we estimate will require three to four weeks, we

porte Corp. v. Pennsylvania-Dixie Cement Corp., 164 Md. 642, 165 A. 195, 168 A. 844, 108 A.L.R. 1474 (1933).

12. The items comprising category I, in addition to the purchase price, were expenditures reasonably made in perform-

ance of Fairchild's obligations under the contract and were clearly recoverable. See Restatement, Contracts § 333, *When Damages May be Measured By Expenditures in Part Performance,* comment (b) (1932).

strongly recommend that Miracle Marine take no further action in connection with securing additional distributors, committing for promotional or advertising work, performing boat or other marine product design work or engaging in any other activity in furtherance of the Fairchild-Miracle Marine Agreement that would result in additional expenditures or commitments."

On September 2, 1960, the following telegram was sent by Fairchild to all its distributors:

"Fairchild currently reviewing its entire line of boat models and related marine products and production scheduling thereof. Pending decision you should ignore current price lists, model descriptions and related sales literature; also strongly recommend you make no commitments with dealers and others or expenditures for prosecuting sales program. After decisions reached Fairchild will inform you directly and promptly."

Fairchild requested and received a memorandum of law from its attorney advising Fairchild of possible legal liability to its distributors if the decision were made to cancel the boat program.

Despite the possibility of incurring legal liability, the final decision to cancel the boat program apparently was made in October 1960, for that month Fairchild entered negotiations for the sale of the press to Miracle Marine. The negotiations advanced to the stage where a proposed bill of sale was drawn. Miracle Marine was unable to finance the sale, however, and no new purchaser appeared.

Pursuant to Fairchild's decision to abandon the boat program, on November 2, 1960, all distributors were notified that their 1961 distributorship contracts would not be renewed and they were invited "to terminate the distributorship agreements immediately." On December 2, 1960, Fairchild ordered Miracle Marine to stop all promotional work and indicated that any further activities were to be at Miracle Marine's "own risk." As a final footnote, later that month Fairchild advised the State of Maryland that its five boat licenses, at $2.00 per license, would not be renewed for 1961.

The above evidence, consisting in its entirety of documents taken from Fairchild's own files, conclusively demonstrates that Fairchild made the decision to abandon the boat program without regard to the delays being experienced in the installation and functioning of the press. Hufford's breach on June 1, 1961, therefore, was unconnected with the liabilities Fairchild incurred to its distributors by reason of its decision to abandon the boat program in October 1960. Fairchild, having failed in its attempt to prove the necessary nexus between the two events, may not recover the damages under category II. Restatement, Contracts § 333 (1932).[13]

For the above reasons, we hold that the damages sustained by Fairchild as a result of Hufford's breach amounted to $304,926.90, with appropriate interest. The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for entry of judgment in accordance with this opinion.

Remanded.

13. The logical mind may ask, "Why did Fairchild exhibit such Job-like patience with Hufford, waiving all claims to a breach prior to June 1, 1961, when Fairchild should have welcomed the first opportunity to rescind the contract after abandoning the boat program?" Again, Fairchild's own files furnish the answer. Fairchild originally conceived that the press, when operable, would have many uses, *inter alia:* stretching radar antennae, automotive hard tops and body components, roof panels for lightweight freight cars, and half hulls for commercial crafts. When Fairchild failed to attract the anticipated business, it then turned to other alternatives. First, it attempted to sell the press; later, this failing, it sought to rescind the contract. Hufford, as discussed above, provided the grounds for the successful achievement of the second alternative.